UNITED STATES of America, Plaintiff–Appellee,

v.

Juan BAPTISTA–RODRIGUEZ, Ramon Calvo, and Julio R. Diaz, Defendants–Appellants.

No. 91–5621.

United States Court of Appeals, Eleventh Circuit.

April 1, 1994.

---

Richard C. Gagliano, Miami, FL, for Baptista–Rodriguez.

Jeffrey D. Feldman, Fine, Jacobson, Schwartz, Nash & Block, Miami, FL, for Diaz.

Mel Black, Miami, FL, for Calvo.

Dexter W. Lehtinen, U.S. Atty., Lloyd King, Asst. U.S. Atty., Miami, FL, for U.S.

Before TJOFLAT, Chief Judge, KRAVITCH and DUBINA, Circuit Judges.

KRAVITCH, Circuit Judge:

Appellants Julio Diaz, Ramon Calvo, and Juan Baptista–Rodriguez (Baptista) were convicted of conspiracy and attempt to import and possess cocaine. For the reasons below, we affirm the convictions of Calvo and Baptista but reverse the judgment against Diaz and remand his case to the district court.

I.

The government adduced evidence that in 1987 Diaz proposed to Rene DeLamar a scheme to smuggle cocaine into the United States. Diaz joined in the enterprise Robert Treco, who had access to property in the Bahamas via which they could transship the cocaine. The plan called for the drugs to be flown from Colombia to the Bahamas, then shipped by small boat from the Bahamas to the United States.

In search of a pilot to fly the cocaine out of Colombia, Treco met Special Agent Michael McManus of the U.S. Drug Enforcement Administration (DEA) and Carlos Toro, a DEA confidential informant with connections in the Latin American drug trade. McManus was posing undercover as a drug smuggler who had a plane available to transport cocaine.

In September 1987, Treco informed Toro that Treco's principal—identified only as "Doc"—needed an immediate source of cocaine, because poor weather conditions temporarily had stalled the main importation venture. At McManus's direction, Toro responded that McManus could sell Doc 100 kilograms of cocaine. McManus agreed to deliver to Treco a one-kilogram sample.

On September 29, 1987, McManus and Treco met in a Miami hotel room. In McManus's presence Treco telephoned Doc, then informed McManus that Doc was coming over. A few minutes later, Julio Diaz, a

doctor, arrived carrying a briefcase. McManus and Diaz discussed both the Bahamian smuggling venture and the 100-kilogram side deal. Diaz told McManus that he had brought the briefcase to take possession of the promised sample for his confederates to inspect. Treco and Diaz became upset when McManus replied that although he was prepared to convey the 100 kilograms, he had not brought the sample, being unwilling to release a kilogram of cocaine to individuals he hardly knew. McManus also demanded to see the full purchase price of $950,000 before he would deliver the goods. The transaction was never completed.[1]

Returning to the primary operation, in October 1987 DeLamar hosted a meeting at his Miami office. The purpose of the gathering was for "Manolo," a representative of the Colombian cartel that owned the cocaine, to meet the "boat people"—the individuals who were to transport the cocaine from the Bahamas to the United States. Present at the meeting were Diaz, Calvo, Baptista, and Jose Luis Ruiz. Diaz informed Manolo that Baptista and Calvo were the "boat people."

By early November 1987 the operation was nearing its climax. On or about November 13, Treco, Calvo, Baptista, Ruiz, and others convened at the Pilot House Hotel in Nassau, the Bahamas. The group discussed certain difficulties that had arisen relating to the impending transshipment into the United States. The next day, Diaz, Calvo, Baptista, DeLamar, and Ruiz travelled by boat to the Bahamian island of Chub Cay.

On November 15, 1987, a DEA plane flew to Colombia and was loaded with cocaine. The plane then flew to a clandestine airstrip on Chub Cay. There, members of the Bahamian Police Force, working with the DEA, arrested several people and confiscated approximately 530 kilograms of cocaine. At a nearby residence, police apprehended Calvo, Baptista, DeLamar, and Ruiz. Diaz was taken into custody the following day.

The Bahamian government charged the appellants with conspiracy to import and possess cocaine. After proceedings lasting more than a year, the presiding magistrate declared the charges a "nullity." It is unclear whether this means the appellants were acquitted or whether, in essence, a mistrial was declared. Thereafter, in June 1989, the appellants were brought to the United States to face charges in federal court.

## II.

The appellants were charged together with Ruiz, DeLamar, Treco, and others in a multi-count indictment. Counts I through IV alleged conspiracy and attempt to import cocaine into the United States and to possess cocaine with intent to distribute, all in connection with the Colombia–Bahamas–United States importation scheme. *See* 21 U.S.C. §§ 841(a)(1), 846, 952(a) & 963. Counts V and VI applied solely to Diaz, Treco, and Treco's brother, and charged conspiracy and attempt to possess cocaine with intent to distribute, in connection with the 100-kilogram side deal discussed (although never consummated) on September 29, 1987.

Prior to trial, DeLamar agreed to plead guilty and testify on behalf of the government. Based in part on his testimony, a jury convicted Diaz, Calvo, Baptista, and Ruiz on all counts.[2] Diaz, Calvo, and Baptista now challenge their convictions on several grounds. Ruiz, who had been out of jail on bond during the trial, fled prior to the return of the verdict and is not a party to this appeal. In Part III of this opinion we discuss a double jeopardy issue raised jointly by all three appellants. In Parts IV, V, and VI we address the individual claims of error asserted by Diaz, Calvo, and Baptista respectively.

## III.

■ All three appellants contend that the district court erred when it denied their joint

---

1. McManus's refusal to give Diaz the sample and his insistence on seeing the full purchase price up front were consequences of the fact that McManus did not actually have 100 kilograms of cocaine to sell. He had used "Doc's" immediate need for cocaine as a way of drawing out his

identity. Because he could not consummate the deal, McManus intentionally created a situation that was unacceptable to Diaz and Treco.

2. The Trecos were never arrested by American law enforcement authorities.

motion to dismiss on the grounds of double jeopardy. They claim that jeopardy attached when they were tried in the Bahamas and that the instant prosecutions violated their constitutional right not to be twice prosecuted for the same offense. *See, e.g., United States v. Dixon,* —— U.S. ——, ——, 113 S.Ct. 2849, 2855, 125 L.Ed.2d 556 (1993). A district court's double jeopardy ruling raises a question of law, which this court reviews *de novo. United States v. Benefield,* 874 F.2d 1503, 1505 (11th Cir.1989).

### A.

When a defendant moves to dismiss an indictment on double jeopardy grounds, he bears the initial burden of establishing a nonfrivolous prima facie claim. *E.g., United States v. Nino,* 967 F.2d 1508, 1510 (11th Cir.1992), *cert. denied,* —— U.S. ——, 113 S.Ct. 1432, 122 L.Ed.2d 799 (1993); *United States v. Stricklin,* 591 F.2d 1112, 1117–18 (5th Cir.), *cert. denied,* 444 U.S. 963, 100 S.Ct. 449, 62 L.Ed.2d 375 (1979).[3] Only after the defendant crosses this threshold does the burden of persuasion shift to the government to prove that no constitutional violation exists. *E.g., Nino,* 967 F.2d at 1510; *Benefield,* 874 F.2d at 1505. Although a defendant typically can make out a prima facie case by resort to the pleadings from the respective prosecutions, supplemental fact-finding may be necessary. To warrant an evidentiary hearing, however, the defendant must at least allege facts that, if proved, would make out a prima facie case. "Absent a proffer of evidence demonstrating a non-frivolous double jeopardy claim there is no obligation to hold an evidentiary hearing...." *United States v. Sturman,* 679 F.2d 840, 844 (11th Cir.1982), *cert. denied,* 459 U.S. 1171, 103 S.Ct. 816, 74 L.Ed.2d 1014 (1983); *accord United States v. Garcia,* 721 F.2d 721, 723 n. 2 (11th Cir.1983).

As will become evident from the next section, the appellants here could not establish a prima facie case from the pleadings in the Bahamian and American prosecutions alone. Rather, to prevail they would have had to present evidence that American au-

thorities manipulated or interfered unduly with their prosecution by the government of the Bahamas. The district court, however, denied the appellants' motion to dismiss without conducting an evidentiary hearing. The precise question presented, therefore, is whether the allegations in the appellants' motion raise a prima facie claim under the Double Jeopardy Clause. If not, then the appellants were not entitled to an evidentiary hearing on their motion to dismiss.

### B.

The Fifth Amendment provides that no person shall "be subject for the same offence to be twice put in jeopardy of life or limb." U.S. Const. amend. V. This guarantee protects defendants against successive prosecutions for the same criminal offense. *E.g., Dixon,* —— U.S. ——, 113 S.Ct. at 2855. A central issue in any double jeopardy case is whether successive prosecutions charge the "same offence."

For decades the Supreme Court has held that elementally identical offenses are nevertheless different for purposes of the Double Jeopardy Clause when they are charged by separate sovereigns. *See, e.g., United States v. Wheeler,* 435 U.S. 313, 317, 98 S.Ct. 1079, 1082–83, 55 L.Ed.2d 303 (1978); *United States v. Lanza,* 260 U.S. 377, 382, 43 S.Ct. 141, 142, 67 L.Ed. 314 (1922). This "dual sovereignty doctrine" is rooted in the common-law conception of crime as an offense against the sovereignty of a government. *Heath v. Alabama,* 474 U.S. 82, 88, 106 S.Ct. 433, 437, 88 L.Ed.2d 387 (1985). The rationale is simple:

> When a defendant in a single act violates the peace and dignity of two sovereigns by breaking the laws of each, he has committed two distinct offenses.... [W]hen the same act transgresses the laws of two sovereigns, "it cannot be truly averred that the offender has been twice punished for the same offense."

*Id.* (quoting *Moore v. Illinois,* 55 U.S. (14 How.) 13, 19, 14 L.Ed. 306 (1852)).

---

3. In *Bonner v. City of Prichard,* 661 F.2d 1206, 1209 (11th Cir.1981) (en banc), we adopted as circuit precedent all decisions of the former Fifth Circuit rendered prior to October 1, 1981.

The appellants concede that the Bahamas is an independent sovereign and that this fact ordinarily would preclude their double jeopardy claims. *See United States v. Martin,* 574 F.2d 1359, 1360 (5th Cir.), *cert. denied,* 439 U.S. 967, 99 S.Ct. 456, 58 L.Ed.2d 425 (1978). They assert, nonetheless, that an exception to the dual sovereignty doctrine applies in this case. They argue that the Bahamian prosecution was merely a "sham"—a "tool or 'cat's paw' " of the United States—and thus the two countries should be viewed as a single sovereign for purposes of double jeopardy.

■ The "sham prosecution" exception to the dual sovereignty doctrine was alluded to in *Bartkus v. Illinois,* 359 U.S. 121, 79 S.Ct. 676, 3 L.Ed.2d 684 (1959). In that case the Supreme Court upheld a state-court conviction after a jury had acquitted the defendant on substantially similar federal charges. Reaffirming the dual sovereignty doctrine, Justice Frankfurter noted that the record did not

> support the claim that the State of Illinois in bringing its prosecution was merely a tool of the federal authorities, who thereby avoided the prohibition of the Fifth Amendment against a retrial of a federal prosecution after an acquittal. It [did] not sustain a conclusion that the state prosecution was a sham and a cover for a federal prosecution, and thereby in essential fact another federal prosecution.

*Id.* at 123–24, 79 S.Ct. at 678. From this language courts have inferred a sham prosecution exception. *See, e.g., In re Kunstler,* 914 F.2d 505, 517 (4th Cir.1990), *cert. denied,* 499 U.S. 969, 111 S.Ct. 1607, 113 L.Ed.2d 669 (1991); *United States v. Bernhardt,* 831 F.2d 181, 182 (9th Cir.1987), *cert. denied,* 488 U.S. 954, 109 S.Ct. 389, 102 L.Ed.2d 379 (1988); *United States v. Aboumoussallem,* 726 F.2d 906, 910 (2d Cir.1984); *United States v. Liddy,* 542 F.2d 76, 79 (D.C.Cir.1976). To fit within the exception, the defendant must show that one sovereign was so dominated, controlled, or manipulated by the actions of the other that it did not act of its own volition. *United States v. Raymer,* 941 F.2d 1031, 1037 (10th Cir.1991); *Liddy,* 542 F.2d at 79.

■ The Eleventh Circuit has not squarely confronted the validity of the sham prosecution exception. Twice before we declined to address the question because the defendants had not demonstrated sham prosecutions. *United States v. McRary,* 616 F.2d 181, 185 (5th Cir.1980); *Martin,* 574 F.2d at 1360. Once again, we need not decide whether the exception is valid, because even if it is, the appellants cannot prevail.

### C.

In support of their request for an evidentiary hearing the appellants averred that American, rather than Bahamian, officials: initiated and performed the investigation; conducted all undercover negotiations; arranged for informants to pick up the cocaine and deliver it in the Bahamas; and testified as the principal witnesses during the trial in the Bahamas. In conclusion they asserted that "[t]he entire Bahamian prosecution was either conducted directly by, or supervised and conducted indirectly by, American law enforcement and prosecutorial authorities." [4]

The first four items alleged—the appellants' factual allegations—amount to an assertion that the United States was solely responsible for the discovery and exposure of the smuggling operation. That the United States performed the investigation, however, says little or nothing about whether American authorities interfered with the Bahamian decision to prosecute the appellants after Bahamian police arrested them on Bahamian soil.

■ Every sovereign has the inherent power to determine what shall be an offense against its authority and to punish such offenses. *Wheeler,* 435 U.S. at 320, 98 S.Ct. at 1084. This power is manifested principally through the decision to prosecute—the choice to charge suspected criminals with commission of a crime and to pursue the legal process for obtaining convictions against them. *See, e.g., id.* at 317, 98 S.Ct. at 1082–83 ("The basis for [the dual sovereignty] doctrine is that *prosecutions* under the laws

---

**4.** R. 2–161 at 11.

of separate sovereigns do not" violate the Fifth Amendment.) (emphasis added); *Rinaldi v. United States*, 434 U.S. 22, 28, 98 S.Ct. 81, 84, 54 L.Ed.2d 207 (1977) (per curiam) (noting that separate sovereigns "have legitimate, but not necessarily identical, interests in the *prosecution* of a person for acts made criminal under the laws of both") (emphasis added). To be sure, investigation and apprehension usually are necessary predicates to the punishment of criminals. But prosecution is the formal act by which the government seeks that punishment. Independent sovereigns do not forfeit their right to charge and punish violations of their own laws because some other sovereign had the resources and separate interest to investigate the crimes and expose the criminals. Consequently, we hold that if an exception to the dual sovereignty doctrine exists, that exception requires a showing that one sovereign controlled, dominated, or manipulated the *prosecution* of the defendant by the other.

 None of the factual allegations in the appellants' motion to dismiss suggest that the Bahamas undertook the prosecution in this case for reasons other than its independent determination that the appellants had violated its laws against possession and importation of cocaine. The motion merely states that American law enforcement authorities controlled the investigation.[5] Stripped of its editorial commentary the motion fails adequately to allege that the Bahamian prosecutors were mere puppets, manipulated by the United States. The appellants' last allegation in support of an evidentiary hearing—that "[t]he entire Bahamian prosecution was either conducted directly by, or supervised and conducted indirectly by, American law enforcement and prosecutorial authorities"—does aver American manipulation of the Bahamian prosecution, but it merely states a conclusion without supplying any supporting factual allegations.[6] Self-serving conclusions are insufficient to establish a prima facie case under a narrow exception to the dual sovereignty doctrine. Thus, the district court did not err in refusing to conduct an evidentiary hearing on the appellants' motion to dismiss.[7]

### IV.

In addition to the appellants' joint double jeopardy claim, Diaz challenges his conviction on several grounds that apply to him alone. Diaz's arguments fall into five categories: that the district court impermissibly excluded evidence and curtailed cross-examination regarding his "FBI" theory of defense; that the court improperly denied his requested theory-of-defense charge to the jury; that the prosecutor made improper and prejudicial remarks to the jury; that his sentence on Count V of the indictment should be vacated as that count charges the same offense as Count III; and that the evidence was insufficient to support his conviction on two of the counts against him. Because we conclude that the first category includes reversible error, we need not address Diaz's jury-instruction, prosecutorial-comment, or duplicative-sentence arguments. We do consider Diaz's insufficiency claim, as we must, *see infra* Part IV–D, and we find it unavailing.

5. It should come as no surprise that the United States performed virtually all of the law enforcement work in this case. The scheme was hatched and the primary negotiations were conducted in the United States. Events occurred in the Bahamas only toward the very end. It would have been difficult for the Bahamian police to have been more involved than they were.

6. Of course, the fact that the United States deferred to the Bahamas for the initial prosecution does not mean that the United States controlled that prosecution. Both nations, in an exercise of their independent sovereignties, have pledged to cooperate in interdicting drug traffickers. *See* Single Convention on Narcotic Drugs, Mar. 30, 1961, art. 35, 18 U.S.T. 1407, 1425. This convention expressly provides that offenses committed in part in different countries shall be considered distinct offenses. *Id.* art. 36, 18 U.S.T. at 1425.

7. We do not hold that the extent to which one government controls the investigative phase is irrelevant to a court's inquiry regarding sham prosecution. Evidence that one sovereign dominated the investigation might bolster evidence showing control of the prosecution. We hold only that evidence—or, in the posture of this case, factual allegations—relating to the investigation alone is insufficient to establish a prima facie case under the sham prosecution exception to the dual sovereignty doctrine.

## A.

Before addressing Diaz's particular arguments on appeal, we survey the legal landscape relevant to Diaz's FBI defense and the specifics of that defense theory.

Diaz concedes that he performed the acts for which he was charged. His theory of defense was centered on his assertion that in 1984 FBI Agent Shelley Taft asked him to investigate the Latin American drug trade on behalf of the FBI. Based largely on this alleged request, Diaz claims that he believed he was working as an authorized undercover civilian operative when he arranged the smuggling venture. As such, he contends he lacked the requisite *mens rea* for the crimes: specific intent to violate the law. *See United States v. Juan,* 776 F.2d 256, 258 (11th Cir. 1985); *United States v. Lopez–Lima,* 738 F.Supp. 1404, 1413 (S.D.Fla.1990); *see also United States v. Anderson,* 872 F.2d 1508, 1517 (11th Cir.) (noting that defendants' claims of innocent intent were adequately put before jury in CIPA case), *cert. denied,* 493 U.S. 1004, 110 S.Ct. 566, 107 L.Ed.2d 560 (1989).

To bolster his defense, Diaz sought to testify as to the details and nature of his work as a civilian operative for the FBI between June 1980 and November 1983. This evidence, he believed, would have made more credible his position that he maintained a relationship with the FBI throughout the mid–1980s—the focus of his investigatory work shifting after 1983 to drug-related targets—and that he sincerely believed his 1987 activities fell within the scope of his authority. Diaz's attempt to present evidence of his pre–1984 FBI activities was complicated, however, by the fact that the details of those activities were deemed classified information for purposes of national security.

 The use of classified information in criminal trials is regulated by the Classified Information Procedures Act (CIPA), Pub.L. 96–456, 94 Stat. 2025, 18 U.S.C.App. III §§ 1–16 (1988). CIPA addresses the practice of "graymail" by criminal defendants: threatening to disclose classified information in the course of a prosecution. Prior to the Act, such threats presented the government with a Hobson's choice: either allow disclosure of the classified information or dismiss the indictment against the defendant. *United States v. Collins,* 720 F.2d 1195, 1196–97 (11th Cir.1983); Richard P. Salgado, Note, *Government Secrets, Fair Trials, and the Classified Information Procedures Act,* 98 Yale L.J. 427, 427 (1988). CIPA mitigates this dilemma by prescribing pretrial procedures to help resolve issues of discovery and admissibility of classified information. Salgado, 98 Yale L.J. at 428.

CIPA requires defendants who expect to disclose classified information to notify the court and the government of their intention to do so. 18 U.S.C.App. III § 5.[8] Upon the government's request, the court must then "conduct [an *in camera* ] hearing to make all determinations concerning the use, relevance, or admissibility of classified information that would otherwise be made during the trial or pretrial proceeding." *Id.* § 6(a). If the court determines that the defendant's proffered evidence is irrelevant or otherwise inadmissible, it should issue a ruling *in limine* precluding the introduction of that information at trial. If the evidence would be admissible at trial, the burden shifts to the government to offer in lieu of the classified evidence either a statement admitting relevant facts that the classified information would tend to prove or a summary of the specific classified information. The court shall allow a substitution if it finds that the alternate submission will provide the defendant with substantially the same ability to present his or her defense as would disclosure of the specific classified information. *Id.* § 6(c). Only when specific classified information is necessary to the full presentation of the defense does the government face the dilemma of permitting disclosure or dismissing the charges.

CIPA does not create new law governing the admissibility of evidence. *Collins,* 720

---

**8.** "If the defendant fails to comply with [this requirement] the court may preclude disclosure of any classified information not made the subject of notification and may prohibit the examination by the defendant of any witness with respect to any such information." 18 U.S.C.App. III § 5(b).

F.2d at 1199. It simply ensures that questions of admissibility will be resolved under controlled circumstances calculated to protect against premature and unnecessary disclosure of classified information. Thus, the district court may not take into account the fact that evidence is classified when determining its "use, relevance, or admissibility." *Juan,* 776 F.2d at 258; *Collins,* 720 F.2d at 1199. The relevance of classified information in a given case is governed solely by the well-established standards set forth in the Federal Rules of Evidence. *Anderson,* 872 F.2d at 1514; *see* Fed.R.Evid. 401–03. If the classified information is admissible under ordinary evidentiary analysis it becomes the government's task to propose an alternative way of conveying the information to the jury that is less damaging to national security.

With this factual and legal backdrop in place, we turn to Diaz's contentions on appeal.

### B.

Diaz notified the court and the government about his intent to disclose evidence of his relationship with the FBI prior to November 1983. After a hearing conducted pursuant to section 6 of CIPA, the court concluded that the classified information proffered—in the main, details of Diaz's pre–1984 work for the FBI—was irrelevant to any legitimate defense asserted by Diaz. Accordingly, the court forbade Diaz to reveal any classified information.[9] Because the solitary fact that Diaz had had a relationship with the FBI had been declassified, the district court's order did not preclude testimony as to that fact alone.

 Diaz maintains that the court erred by prohibiting him from introducing details of his pre–1984 relationship with the FBI. A district court's decision to exclude evidence on grounds of relevance will not be disturbed unless it constitutes a clear abuse of discretion. *Anderson,* 872 F.2d at 1515. The court's discretion "does not ... 'extend to

the exclusion of crucial relevant evidence necessary to establish a valid defense.'" *Id.* (quoting *United States v. Wasman,* 641 F.2d 326, 329 (5th Cir. Unit B 1981)) (other citation omitted).

Diaz's argument that the district court abused its discretion is twofold. First, he asserts that the court's holding that the classified information was irrelevant was based upon a misapprehension about the precise nature of his theory of defense. Second, he contends that the excluded evidence was highly relevant as it would have corroborated his claim that his relationship with the FBI continued after 1983. We need not discuss Diaz's first contention because, after reviewing the classified information Diaz desired to introduce, we conclude that this evidence was in fact irrelevant to his claim of innocent intent. Thus, the district court did not abuse its discretion in declaring the evidence inadmissible.

 Although we of course may not disclose classified information in this opinion, we note that the connection between Diaz's 1987 activities and his particular pre–1984 FBI assignments was tenuous at best. Diaz's pre–1984 work was unrelated to the trafficking of controlled substances. Disclosing the details of his activities would have added little or nothing to the declassified fact that he worked for the FBI.

Moreover, substantial evidence was admitted to corroborate Diaz's theory of defense. For example, notwithstanding that the district court's CIPA order only authorized disclosure of "the single fact that he maintained a relationship with the Federal Bureau of Investigation," Diaz was permitted to testify that he had worked as a "civilian operative."[10] This revelation was important because it supported his claim that his 1987 activities were operational in nature. Diaz's defense was braced further when he identified by name his three FBI contacts.[11] This testimony was confirmed by the agents themselves.[12] During cross-examination, two of

---

9. R. 5–264 at 3.

10. *E.g.,* R. 19 at 18–19.

11. *Id.* at 19.

12. *E.g., Id.* at 125–26 (testimony of Agent Morales) (stating that in 1982 Diaz was cooperating with the FBI); *id.* at 164 (testimony of Agent Taft) (stating that he was Diaz's handling agent

the agents even acknowledged that information regarding Diaz's pre–1984 relationship with the FBI was classified, enabling Diaz's counsel to explain to the jury why further details about that relationship could not be divulged. The district court's CIPA order, therefore, did not prevent Diaz from presenting "crucial relevant evidence necessary to establish" his defense. *Anderson,* 872 F.2d at 1515.

To underscore the importance of the proffered evidence, Diaz relies on *United States v. Juan* for the proposition that "[a]ppellant's contention of innocent intent … would strain the credulity of reasonable jurors unless it could be made to appear that, as incredulous as it might seem, the belief may have rested upon a real or genuine basis." 776 F.2d at 258, *quoted in* Initial Brief of Appellant Diaz at 26. But unlike the district court in this case, the district court in *Juan* forbade the defendant to introduce *any* evidence that he had worked for the government. In *Juan* we issued the quoted remark only in holding that the defendant should have been allowed to establish the basic fact that he had had a prior relationship with the government. We stated explicitly what we were *not* holding: "[W]e do not hold that appellant must be allowed to put details of his earlier activity into the record. The defendant/appellant may be accorded a fair trial without such detailed proof." *Id.; see also Anderson,* 872 F.2d at 1517 ("The minutiae of the classified material added little, if anything, to the plausibility of [the defendants'] claim [of innocent intent].")

The same is true here. Diaz was not prevented from informing the jury that he had worked as an operative for the FBI. The district court did not abuse its discretion when it excluded the details of that employment.

## C.

After Diaz testified that in 1984 FBI Agent Taft authorized him to investigate narcotics, the government presented the rebuttal testimony of three FBI agents. These witnesses denied that Diaz ever had been asked to investigate drug trafficking. They also explained that Diaz's activities on behalf of the FBI had been unrelated to narcotics and that Diaz's relationship with the FBI ended in February 1983. Diaz claims that this testimony "opened the door" for introduction of the classified information he previously had sought to present. He argues that even if the district court's original CIPA order was proper, the court abused its discretion by subsequently excluding the details of his earlier relationship with the FBI and by restricting his cross-examination of the agents regarding the nature and scope of that relationship.

 Our review of the record indicates that the agents did not disclose any details of Diaz's pre–1984 activities. Hence, they did not "open the door" to surrebuttal testimony on that subject. Moreover, Diaz did not attempt to introduce such details in evidence after the conclusion of the government's rebuttal case. Thus, the district court did not abuse its discretion by excluding evidence proffered by Diaz. Nor did the district court preclude Diaz from cross-examining the agents as to the nature of his pre–1984 activities. To the contrary, counsel for Diaz elicited from the agents the fact that Diaz's work was operational in nature and involved material that was classified for reasons of national security. As to these items, therefore, Diaz's arguments are without merit.[13]

A serious constitutional question is raised, however, as to testimony regarding Diaz's alleged termination in 1983. FBI Agent Ernie Patino was one of the government's rebuttal witnesses who testified in response to

---

when Diaz was a cooperating civilian for the FBI).

13. Diaz also argues that the government "opened the door" through its redirect examination of DeLamar. DeLamar testified on redirect that when he first met Diaz in 1980 Diaz did not express to him an intention to work for the FBI. We fail to see how this testimony opened the

door to the details of Diaz's subsequent FBI activity. In any event, this line of inquiry was raised by Diaz himself on cross-examination. R. 17 at 194, 198. The district court did not abuse its discretion in allowing the government to clarify on redirect an area of testimony first raised by Diaz.

Diaz's assertion that the FBI authorized him to investigate drug trafficking. Patino testified on direct examination that Diaz's relationship with the FBI ended in February 1983. On cross-examination Diaz's counsel asked Patino whether this fact was documented. Patino answered in the affirmative but noted that the document was classified and that its nature could not be revealed.[14] Diaz asked the court to order that the document, if it existed, be produced. The court refused, reasoning that it already had found all of the classified information in the case to be irrelevant. Counsel for Diaz then sought to cross-examine Patino regarding his knowledge of the document. The court prohibited that as well.

"In all prosecutions, the accused shall enjoy the right ... to be confronted with the witnesses against him." U.S. Const. amend. VI. "The main and essential purpose of confrontation is to secure for the [defendant] the opportunity of cross-examination." *Delaware v. Van Arsdall,* 475 U.S. 673, 678, 106 S.Ct. 1431, 1435, 89 L.Ed.2d 674 (1986) (quotations omitted); *see Kentucky v. Stincer,* 482 U.S. 730, 736, 107 S.Ct. 2658, 2662, 96 L.Ed.2d 631 (1987); *United States v. Williams,* 837 F.2d 1009, 1015 (11th Cir.), *cert. denied,* 488 U.S. 965, 109 S.Ct. 490, 102 L.Ed.2d 527 (1988).

 The defendant's right to cross-examine witnesses is not without limitation. He is entitled only to an opportunity for effective cross-examination, not cross-examination that is effective " 'in whatever way, and to whatever extent, the defense might wish.' " *Stincer,* 482 U.S. at 739, 107 S.Ct. at 2664 (quoting *Delaware v. Fensterer,* 474 U.S. 15, 20, 106 S.Ct. 292, 294, 88 L.Ed.2d 15 (1985) (per curiam)). "[T]rial judges retain wide latitude insofar as the Confrontation Clause is concerned to impose reasonable limits on ... cross-examination based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant." *Van Arsdall,* 475 U.S. at 679, 106 S.Ct. at 1435. Nevertheless, the defendant must be given a " 'full and fair opportunity to probe and ex-

pose [the] infirmities [in a witness' testimony] through cross-examination, thereby calling to the attention of the factfinder the reasons for giving scant weight to the witness' testimony.' " *Williams,* 837 F.2d at 1015 (quoting *Fensterer,* 474 U.S. at 22, 106 S.Ct. at 296). Full cross-examination is particularly critical when the examinee is a chief government witness. *See United States v. Garcia,* 13 F.3d 1464, 1468 (11th Cir.1994).

[19] The district court deprived Diaz of his constitutionally protected opportunity to cross-examine an important government witness when it prohibited counsel from asking Agent Patino any questions about the contents, or even the existence, of the termination document. In particular, the court abused its discretion when it held that the document was immaterial. The question whether the FBI dismissed Diaz as a civilian operative in 1983 lay at the heart of the parties' factual dispute. If the jury had believed that Diaz never stopped working for the FBI or that he was liable to be rehired, it would have been more likely to find that the 1984 meeting at which Diaz claimed Agent Taft authorized him to investigate narcotics actually took place. Conversely, if the jury believed that the FBI terminated Diaz for good in 1983, it would have been much less likely to conclude that the FBI asked him to perform dangerous undercover work in 1984. Hence, it was essential for Diaz to explore fully the government's witnesses' testimony regarding his alleged termination.

The existence and contents of a document purporting to confirm Diaz's termination were especially important areas of inquiry in this regard. The FBI agents earlier had testified that a document usually evidences the fact that a civilian operative has been discharged. If no such document existed, therefore, Diaz could have made a persuasive argument that no termination took place. Even if one did exist, questions would have remained as to, among other things, its authenticity, the circumstances under which it was generated, and any qualifications, conditions, or exceptions it might have contained. Given the dramatic impact the existence of a

14. R. 19 at 182.

corroborating termination document was likely to have in this case, once Patino testified that such a document existed, inquiry regarding the document became not only relevant, but possibly vital to the defense.

Patino was the chief government witness with respect to Diaz's termination. Had cross-examination been allowed, Diaz would have been able to explore, for example, whether Patino authored the report, whether he reviewed the report in preparation for his trial testimony, and how familiar he was with its contents. If Patino did author or review the report, it might have been discoverable by Diaz pursuant to Fed.R.Crim.P. 26.2 or Fed.R.Evid. 612.[15] If Patino did not author the report yet testified about information regarding Diaz's termination which derived from that document, his testimony would have been based upon hearsay and a confrontation problem might have existed. *See, e.g., Ohio v. Roberts,* 448 U.S. 56, 63, 100 S.Ct. 2531, 2537, 65 L.Ed.2d 597 (1980). Either way, the district court prevented Diaz from challenging Patino's credibility on a central factual issue of the case. Consequently, we hold that Diaz's Sixth Amendment rights were violated when he was denied the opportunity to cross-examine Agent Patino regarding the termination report.

The district court held that even if its refusal to order production of the termination document (and, by implication, its refusal to allow cross-examination regarding the document) were erroneous, the error would not be prejudicial to Diaz.[16] The court reasoned that the existence of a document supporting the government's contention that Diaz had been terminated by the FBI could only have damaged Diaz's defense. We have reviewed the document in question and we disagree.

■ To determine whether the denial of cross-examination constitutes harmless error we consider five factors: the importance of the witness's testimony to the government's case; whether the testimony was cumulative; the presence or absence of corroborating or conflicting evidence; the extent of cross-examination otherwise permitted; and the overall strength of the prosecution's case. *Wasko v. Singletary,* 966 F.2d 1377, 1382 (11th Cir.1992). The ultimate inquiry is whether, "assuming that the damaging potential of the cross-examination were fully realized, a reviewing court might nonetheless say that the error was harmless beyond a reasonable doubt." *Van Arsdall,* 475 U.S. at 684, 106 S.Ct. at 1438.

■ Although, once again, we may not divulge the classified information, we hold that the constitutional error in this case was not harmless beyond a reasonable doubt. Patino's testimony was a substantial boon to the government's case. It corroborated the government's position that the FBI terminated Diaz in February 1983, making it less likely that the government authorized him to investigate drug trafficking in 1984. The import of Patino's testimony is highlighted by the fact that the assistant U.S. attorney reminded the jury during closing argument:

15. Rule 26.2 provides in pertinent part:

 (a) Motion for Production. After a witness other than the defendant has testified on direct examination, the court, on motion of a party who did not call the witness, shall order the attorney for the government or the defendant and the defendant's attorney, as the case may be, to produce, for the examination and use of the moving party, any statement of the witness that is in their possession and that relates to the subject matter concerning which the witness has testified.

 \* \* \* \* \* \*

 (f) Definition. As used in this rule, a "statement" of a witness means:

(1) a written statement made by the witness that is signed or otherwise adopted or approved by the witness....
Rule 612 declares similarly:
[I]f a witness uses a writing to refresh memory for the purpose of testifying, either—
 (1) while testifying, or
 (2) before testifying, if the court in its discretion determines it is necessary in the interests of justice,
an adverse party is entitled to have the writing produced at the hearing, to inspect it, to cross-examine the witness thereon, and to introduce in evidence those portions which relate to the testimony of the witness.

16. R. 19 at 187.

"Ernie Patino testified to you he reviewed [Diaz's FBI] file and determined when [Diaz's] relationship was terminated by the FBI."[17] Yet Diaz was *completely prohibited* from examining Patino regarding the termination document.

 Patino was the only witness to testify to the existence of a termination document. His testimony was neither refuted nor corroborated by other evidence. As such, Diaz's only opportunity to combat the government on this point was to inquire of Patino on cross-examination, and successful cross-examination might have had a considerable impact upon the jury. Significantly, the prosecution's case was not overwhelming on the issue whether Diaz possessed the *mens rea* of specific criminal intent. To the contrary, the case came down to a credibility question between Diaz and the agents. Illumination of the circumstances surrounding the termination report might very well have affected the jury's credibility determination. For these reasons, Diaz's conviction must be reversed, his sentence vacated, and his case remanded to the district court for further proceedings.[18]

17. R. 20 at 110.

18. Much of the confusion regarding the relevancy issues in this case is probably attributable to the muddled state of the law in this circuit regarding defenses based on perceived governmental authority. Several defenses may apply when a defendant claims he performed the acts for which he was charged in response to a request from an agency of the government. Some of these defenses have been recognized by this court, some have not, and the validity of yet others remains unresolved.

First, the defendant may allege that he lacked criminal intent because he honestly believed he was performing the otherwise-criminal acts in cooperation with the government. "Innocent intent" is not a defense *per se*, but a defense strategy aimed at negating the *mens rea* for the crime, an essential element of the prosecution's case. This court has recognized "innocent intent" as a legitimate defense tack in cases similar to the one at bar. *See Anderson*, 872 F.2d at 1517–18 & n. 14 (approving jury instruction that defendants should be exonerated if jury entertained reasonable doubt whether defendants acted in good faith under the sincere belief that their activities were exempt from the law); *Juan*, 776 F.2d at 258 (reversing conviction on ground that district court prohibits defendant from introducing evidence necessary to prove defense of lack of criminal intent).

A second possible defense is "public authority." With this affirmative defense, the defendant seeks exoneration based on the fact that he reasonably relied on the authority of a government official to engage him in a covert activity. *Anderson*, 872 F.2d at 1513; *see United States v. Reyes–Vasquez*, 905 F.2d 1497, 1500 n. 5 (11th Cir.1990), *cert. denied*, —— U.S. ——, 111 S.Ct. 2869, 115 L.Ed.2d 1035 (1991). The validity of this defense depends upon whether the government agent in fact had the authority to empower the defendant to perform the acts in question. If the agent had no such power, then the defendant may not rest on the "public authority"; reliance on the *apparent* authority of a government official is not a defense in this circuit, because it is deemed a mistake of law, which generally does not excuse criminal conduct. *Anderson*, 872 F.2d at 1515; *United States v. Rosenthal*, 793 F.2d 1214, 1236, *modified on other grounds*, 801 F.2d 378 (11th Cir.1986), *cert. denied*, 480 U.S. 919, 107 S.Ct. 1377, 94 L.Ed.2d 692 (1987). A defendant legitimately may rely, however, on a government official's real authority to authorize the defendant's conduct. *Anderson*, 872 F.2d at 1515; *Rosenthal*, 793 F.2d at 1235–36; *see Lopez–Lima*, 738 F.Supp. at 1408. Actions properly sanctioned by the government are not illegal.

A third possible defense in cases like the present one is "entrapment by estoppel." This defense applies when a government official tells a defendant that certain conduct is legal and the defendant commits what would otherwise be a crime in reasonable reliance on the official's representation. *See United States v. Hedges*, 912 F.2d 1397, 1405 (11th Cir.1990); *United States v. Clegg*, 846 F.2d 1221, 1222 (9th Cir.1988) (applying defense to defendant who claimed government officials solicited, encouraged, and assisted his efforts to smuggle weapons to rebels in Afghanistan). Although this court generally has recognized the defense of entrapment by estoppel, *see Hedges*, 912 F.2d at 1405, one panel has stated in dictum that such a defense is foreclosed when a defendant claims he believed he was working on behalf of the government in an intelligence gathering capacity, *see Reyes–Vasquez*, 905 F.2d at 1500.

It is not for this panel to untangle this web of "FBI defense" cases. For now it will suffice to note that confusion such as that which occurred in this case can be minimized or avoided in the future if litigants (and courts) state with precision the theory (or theories) they are advancing. Doing so will enable all involved to address whether the defenses proposed are or should be valid, invalid, or unresolved in this circuit. *See Reyes–Vasquez*, 905 F.2d at 1500 ("Plain talk by lawyers is necessary for clear understanding by judges. Whenever a litigant has a meritorious proposition of law which is seriously pressing upon the attention of the trial court, he should raise that point in such clear and simple language that the trial court may not misunderstand it....") (quotation omitted).

### D.

Diaz also argues that the evidence against him was constitutionally insufficient to support his convictions on Counts V and VI of the indictment. Count V charged Diaz with conspiring to possess cocaine with intent to distribute, in connection with the September 1987 100–kilogram side deal. Count VI charged him with the substantive offense of attempt to do the same. We address this claim notwithstanding our reversal of Diaz's conviction on confrontation grounds because if the evidence were insufficient on Counts V and VI, the Double Jeopardy Clause would bar retrial on those counts. *Burks v. United States,* 437 U.S. 1, 11, 98 S.Ct. 2141, 2147, 57 L.Ed.2d 1 (1978); *United States v. Khoury,* 901 F.2d 948, 961 (11th Cir.1990).

The legal principles guiding our review of this claim are firmly established:

> The sufficiency of the evidence is a question of law that is reviewed de novo. In reviewing this claim we examine the evidence in the light most favorable to the government. It is not necessary that the evidence exclude every reasonable hypothesis of innocence or be wholly inconsistent with every conclusion except that of guilt, as a jury is free to choose among reasonable constructions of the evidence. The reversal of a conviction for insufficient evidence is warranted only if no reasonable jury could find proof of guilt beyond a reasonable doubt. Nevertheless, there must be sufficient evidence to support all necessary elements of the crime.

*United States v. Thomas,* 8 F.3d 1552, 1556 (11th Cir.1993) (citations and quotations omitted).

 To prove conspiracy, the government must show that the defendant agreed with one or more persons to commit a crime and that the defendant knowingly and voluntarily joined or participated in the illegal venture. *E.g., United States v. Mendoza–Cecelia,* 963 F.2d 1467, 1479 (11th Cir.1992). Direct evidence of an illegal agreement is not necessary; circumstantial evidence may suffice. *United States v. McDonald,* 935 F.2d 1212, 1219 (11th Cir.1991). Nor must the

object of the conspiracy actually be achieved. *United States v. Cuni,* 689 F.2d 1353, 1356 (11th Cir.1982). To prove an illegal attempt, the government must show that the defendant had the specific intent to engage in criminal conduct and that he took a substantial step toward commission of the offense. *United States v. Collins,* 779 F.2d 1520, 1527 (11th Cir.1986).

DEA Agent McManus testified that in September 1987, Carlos Toro, the confidential informant working with him, learned from Robert Treco that Treco's superior—"Doc"—was in desperate need of cocaine in addition to that expected to be smuggled through the Bahamas. At McManus's direction, Toro arranged with Treco for McManus to sell Doc 100 kilograms of cocaine. A short time later Treco met with McManus. Treco confirmed that his group would be willing to purchase the entire 100 kilograms. Treco and McManus agreed that they would meet again the following day, at which time McManus would provide a one-kilogram sample for inspection.

On September 29, 1987, McManus, Toro, and Treco met at a Miami hotel. Treco telephoned Doc, informing him: "The people are here. Come on over." Some fifteen minutes later, Dr. Julio Diaz arrived at the hotel room carrying a briefcase. After a brief discussion about the main smuggling operation, the conversation turned to the sale of the 100 kilograms. McManus explained to Diaz and Treco that he had not brought the promised sample because he felt uncomfortable about meeting a buyer for the first time with a kilogram of cocaine in his possession and allowing a kilogram of his cocaine to "walk around the streets of Miami."

 Diaz and Treco were disturbed by this unexpected turn of events. Diaz stressed to McManus that he had brought the briefcase with him so that he could show the sample to his buyers. The transaction was never consummated.[19]

This evidence was sufficient for a reasonable jury to find beyond a reasonable doubt that Diaz knowingly and willfully agreed to possess 100 kilograms of cocaine with intent

19. R. 13 at 173–83; R. 14 at 15–23.

to distribute and that he took substantial steps toward completion of the offense. Viewed together, Treco's initial negotiations with Toro and McManus, Treco's telephone call to Diaz, Diaz's subsequent appearance at the hotel, and Treco's and Diaz's common reactions to McManus's refusal to deliver the sample indicate that Diaz and Treco entered into a criminal agreement to possess with intent to distribute the cocaine promised by McManus. Diaz's arrival at the hotel room, briefcase in hand for the purpose of taking the sample to his potential buyers, constituted a significant move toward completion of the substantive offense. That the transaction was not consummated is immaterial to the inchoate offenses of conspiracy and attempt. Accordingly, the evidence was sufficient to support Diaz's convictions on Counts V and VI.

### V.

Ramon Calvo raises three individual claims of error in addition to the appellants' joint double jeopardy claim. The first two arguments charge that the district court erroneously restricted his cross-examination of DEA Agent McManus. His third claim is that the government improperly vouched for the credibility of its witnesses. These claims are without merit.

### A.

On direct examination, the government asked Agent McManus what precautions the DEA took to ensure the accuracy of the information it received from Carlos Toro, its confidential informant. McManus replied that Toro was given a polygraph examination.[20] None of the defense attorneys objected to this response. Nevertheless, at the conclusion of the day's testimony counsel for Calvo and Baptista moved for a mistrial on the ground that McManus's mention of a polygraph was improper and prejudicial. *See United States v. Piccinonna*, 885 F.2d

1529, 1535 (11th Cir.1989) (en banc) (allowing strictly limited use of polygraph evidence).

After a lengthy discussion, the parties and the court reached a remedial compromise. Calvo and Baptista withdrew their motions for a mistrial. Counsel, in exchange, was permitted to elicit on cross-examination that Toro had taken a polygraph in another case and had failed that examination.[21] This compromise was intended to cure any prejudice suffered by the defense as a result of McManus's earlier testimony. The court went to great lengths to emphasize that the scope of the remedial cross-examination would be quite limited. It confirmed with defense counsel:

> Is that acceptable to the defense, that you could cure the error that you perceive ... by asking Agent McManus the two questions regarding polygraph [*i.e.,* whether McManus was aware that Toro took a polygraph test in another case and that he failed that test]? [22]

Calvo's counsel acceded to this arrangement.[23]

During cross-examination, counsel for Baptista asked McManus, "Is it not true he [Toro] did fail two polygraphs?" McManus conceded that Toro had shown signs of deception on a polygraph in a separate case.[24] Calvo claims that the district court unconstitutionally restricted his right of cross-examination by prohibiting his counsel from exploring further the circumstances surrounding Toro's failed polygraph examination.

 The Confrontation Clause guarantees criminal defendants an opportunity to impeach through cross-examination the testimony of witnesses for the prosecution. *E.g., Van Arsdall*, 475 U.S. at 678–79, 106 S.Ct. at 1435; *United States v. Sheffield*, 992 F.2d 1164, 1168 (11th Cir.1993). As discussed in Part IV–C above, however, this right is not unlimited. Trial judges retain wide latitude to impose reasonable limits on cross-examination based on concerns about, among other things, confusion of the issues or interroga-

---

**20.** R. 13 at 133.

**21.** R. 13 at 202.

**22.** R. 13 at 203–04.

**23.** R. 13 at 205.

**24.** R. 15 at 121.

tion that is repetitive or only marginally relevant. *Van Arsdall,* 475 U.S. at 679, 106 S.Ct. at 1435; *see Olden v. Kentucky,* 488 U.S. 227, 231, 109 S.Ct. 480, 483, 102 L.Ed.2d 513 (1988). Such restrictions are reviewed solely for abuse of discretion. *See, e.g., United States v. Cohen,* 888 F.2d 770, 775 (11th Cir.1989). A defendant's confrontation rights are satisfied when the cross-examination permitted exposes the jury to facts sufficient to evaluate the credibility of the witness and enables defense counsel to establish a record from which he properly can argue why the witness is less than reliable. *United States v. Bennett,* 928 F.2d 1548, 1554 (11th Cir.1991); *see Sheffield,* 992 F.2d at 1168.

■ In the first place, Toro never testified in this case, so his credibility was of only marginal importance. Nevertheless, the district court allowed counsel for Baptista to elicit from Agent McManus the concession that Toro had demonstrated signs of deception on a polygraph examination he took in an unrelated case. This admission was sufficient to offset any damage suffered by the defense as a result of McManus's earlier testimony that the FBI took steps to verify Toro's information by giving him a polygraph test; from it, defense counsel properly could have argued that Toro was less than reliable. Further questioning by counsel for Calvo would have been cumulative. Further exploration of the circumstances surrounding the failed polygraph would have brought before the jury a host of details irrelevant to the case at bar. The limited cross-examination was in accordance with the bargain to which Calvo's counsel assented. Hence, the district court did not abuse its discretion in curtailing Calvo's cross-examination of McManus on this point.

### B.

Calvo also contends that he was deprived of his fair trial and confrontation rights when the district court prohibited counsel for defendant Ruiz from eliciting information from Agent McManus that would have impeached DeLamar, the confessed co-conspirator who testified on behalf of the government. Coun-

sel sought to bring out prior inconsistent statements made by DeLamar of which McManus presumably was aware, as well as other facts relating to DeLamar's reliability, bias, and motive for testifying. The district court precluded the impeachment of DeLamar through McManus because DeLamar had not yet testified.

■ Neither the Confrontation Clause nor the Due Process Clause restricts a trial judge's broad discretion to exercise reasonable control over the order in which litigants interrogate witnesses and present evidence. *See* Fed.R.Evid. 611(a); *Van Arsdall,* 475 U.S. at 679, 106 S.Ct. at 1435; *Jones v. Dugger,* 928 F.2d 1020, 1025 (11th Cir.), *cert. denied,* —— U.S. ——, 112 S.Ct. 216, 116 L.Ed.2d 174 (1991). The Constitution is offended only when the defendant is denied the opportunity effectively to attack the credibility of the prosecution's witnesses. *See Van Arsdall,* 475 U.S. at 679, 106 S.Ct. at 1435. In this case, the district court did not prevent Calvo from challenging DeLamar's credibility. On the contrary, Calvo's counsel cross-examined DeLamar extensively, eliciting, among other things, concessions that DeLamar fraudulently had held himself out as a doctor; that his plea agreement with the government would enable him to avoid the harsh conditions of Bahamian prison, giving him a powerful motive to testify; and that he could not remember which alleged conspirators said what during their various meetings.[25] In fact, the district court did not prohibit counsel from exploring any area on cross-examination. In addition, Calvo could have called witnesses to undermine DeLamar's believability further. He failed to do so. Thus, the district court did not abridge Calvo's constitutional rights.

■ Impeachment of a witness who has not yet testified, by its very nature, may be confusing to a jury. In addition, anticipatory impeachment may turn out to be irrelevant, because the government may elect not to call the expected witness. When, as here, the impeachment is attempted through cross-examination of another witness, it may be beyond the scope of cross-examination, because

25. R. 18 at 22–53.

the credibility of a future witness typically is not an appropriate subject on direct examination. *See* Fed.R.Evid. 611(b).[26] Thus, we conclude that the district court did not abuse its discretion when it precluded the defense from using the cross-examination of Agent McManus to impeach the expected witness, DeLamar. *See United States v. Portis,* 542 F.2d 414, 417 (7th Cir.1976) ("If the jury is to hear refuting testimony, it would ordinarily appear to be preferable that such testimony be directed toward actual testimony heard by the jury. That which will be heard must necessarily remain somewhat in the speculative area until it is articulated from the witness stand.").[27]

## C.

▆ Finally, Calvo argues that the prosecutor improperly vouched for the credibility of the government's witnesses—in particular, for Toro, the DEA's confidential informant—when she asked Agent McManus the following question: "As to this case, and your dealings with Mr. Toro, what sort of things did you do in the course of this investigation to assure the evidence you received was true?"[28] As reported above, McManus replied that Toro had been given a polygraph examination regarding the information he provided to the DEA.

Attempts to bolster a witness by vouching for his credibility are normally improper and error. The test for improper vouching is whether the jury could reasonably believe that the prosecutor was indicating a personal belief in the witness' credibility.... [A] prosecutor may implicitly vouch for the witness' veracity by indicating that information not presented to the jury supports the testimony.

*United States v. Sims,* 719 F.2d 375, 377 (11th Cir.1983), *cert. denied,* 465 U.S. 1034, 104 S.Ct. 1304, 79 L.Ed.2d 703 (1984) (quotations and citations omitted); *accord United States v. Eyster,* 948 F.2d 1196, 1206 (11th Cir.1991). Referring to the fact that a witness took a polygraph test may amount to implicit vouching for the credibility of that witness. *See United States v. Hilton,* 772 F.2d 783, 786 (11th Cir.1985); *United States v. Brown,* 720 F.2d 1059, 1072 (9th Cir.1983).

▆ We need not decide whether the prosecutor's question about which Calvo complains was improper because even if it was, that error was harmless beyond a reasonable doubt. *See United States v. Rosa,* 891 F.2d 1063, 1067 (3d Cir.1989) (holding that vouching by reference to polygraph test may constitute harmless error); *United States v. Porter,* 821 F.2d 968, 974 (4th Cir.1986) (same), *cert. denied,* 485 U.S. 934, 108 S.Ct. 1108, 99 L.Ed.2d 269 (1988). As for the

---

**26.** "Cross-examination should be limited to the subject matter of the direct examination and matters affecting the credibility of the witness [being cross-examined]." Fed.R.Evid. 611(b).

**27.** Calvo also complains that the district court did not allow him to proffer the evidence he would have sought to elicit from McManus regarding DeLamar. We reaffirm our precedent stressing the importance of counsel making and courts accepting proffers of evidence. *See United States v. Winkle,* 587 F.2d 705, 710 (5th Cir.), *cert. denied,* 444 U.S. 827, 100 S.Ct. 51, 62 L.Ed.2d 34 (1979). An offer of proof serves dual functions: (1) informing the court and opposing counsel of the precise substance of the evidence in question, enabling them to take appropriate action; and (2) perfecting the record for appellate review. *Thomas v. Wyrick,* 687 F.2d 235, 239 (8th Cir.1982), *cert. denied,* 459 U.S. 1175, 103 S.Ct. 824, 74 L.Ed.2d 1020 (1983). "This circuit will not even consider the propriety of the decision to exclude the evidence at issue, if no offer of proof was made at trial." *Winkle,* 587 F.2d at 710; *see* Fed.R.Evid. 103(a)(2) (providing

that error may not be predicated on exclusion of evidence unless "the substance of the evidence was made known to the court by offer or was apparent from the context within which questions were asked").

The district court's refusal to accept a proffer, however, was not reversible error under the circumstances of this case. As noted above, Calvo was not ultimately prevented from offering any information in evidence. Furthermore, the known fact that Calvo sought to impeach DeLamar was sufficient for the district court to have taken action given the court's broad discretion to preclude impeachment of a witness yet to testify. It also bears noting that counsel's attempt to make a proffer came after a sidebar conference during which he failed to make an offer of proof and during which the district judge warned counsel repeatedly not to ask questions designed to impeach DeLamar. R. 15 at 111–15. The court retains broad discretion to control its courtroom and to ensure compliance with all of its rulings and orders.

**28.** R. 13 at 133.

contention that the prosecutor reinforced the credibility of Toro, we reiterate that Toro never testified and any prejudice suffered as a result of the mention of the polygraph was cured when the defense elicited during its cross-examination of Agent McManus that Toro had shown signs of deception on a polygraph he took in another case. Any implication as to Toro's reliability had at most a minor effect on the result in this case.

▮ Calvo also argues more generally that the offending question and response amounted to vouching for *all* of the government's witnesses. He reasons that "[t]he jury surely believed that since such verification of testimony [the use of polygraph examinations] of non-witnesses is done, it will also be done on the testimony and evidence presented by the actual testifying witnesses." [29] We decline to make this leap of logic. The question posed to Agent McManus specifically referred to McManus's "dealings with Mr. Toro." Toro was a confidential informant who had longtime ties to leading figures in the Latin American drug trade. That the government would take precautions to ensure the reliability of such an informant's information would not likely lead a jury to believe that the government gave the same verification test to all of its witnesses.

The exchange at issue occurred early in the testimony of Agent McManus, who was the first witness for the prosecution. Neither of the prosecutors mentioned polygraph examinations subsequently. Significantly, the government did not attempt to link the credibility of any of its witnesses to the taking of polygraph tests. Hence, there can be no reasonable doubt that the verdict was unaffected by the prosecutor's lone question and Agent McManus's unexpected response. *Compare Hilton,* 772 F.2d at 785–86 (reversing conviction when prosecutor mentioned polygraph in closing argument) *with Porter,* 821 F.2d at 974 (holding that admission of plea agreement containing provision that witness agreed to take polygraph test was harmless error when government made no further use of plea agreement or polygraph

and at no other time attempted to link witnesses credibility to the agreement).

## VI.

▮ Juan Baptista contends that the evidence was insufficient to support his conviction. He argues that the evidence against him proves nothing more than his "mere presence" as the operation unfolded. Mere presence at the scene of a drug transaction is insufficient to support a conviction for controlled-substance offenses. *See, e.g., McDonald,* 935 F.2d at 1219; *United States v. Kincade,* 714 F.2d 1064, 1065 (11th Cir.1983).

▮ Viewed in the light most favorable to the government, the evidence at trial showed as follows:

In mid-October 1987, a meeting was held at DeLamar's Miami office. One purpose of the meeting was for Manolo, the representative of the Colombian group that owned the cocaine, to meet the "boat people," the individuals who would be transporting the cocaine from the Bahamas to the United States. Juan Baptista was present at this meeting and was identified as one of the "boat people".

A few weeks later, as the operation's denouement approached, another meeting was held with the "boat people," this one at the Pilot House Hotel in Nassau. Baptista was present here as well. The morning after the Nassau meeting, DeLamar obtained "some brushes and some other stuff" that Baptista and Calvo would need to conceal the hidden area of the boat in which they were to smuggle the cocaine. Later that morning, a group including Baptista met underneath a bridge and then set out in Calvo's boat for the island of Chub Cay. Upon reaching the island, the group proceeded to a private residence. There, Bahamian police arrested Baptista together with Calvo, Ruiz, and DeLamar. DeLamar testified that he had conspired with these people to import cocaine into the United States.[30]

This evidence is sufficient for a reasonable factfinder to conclude beyond a reasonable doubt that Baptista willfully participated in

---

**29.** Reply Brief of Appellant Calvo at 11.

**30.** R. 17 at 178–91, 226; R. 18 at 58–60.

the conspiracy and took a substantial step toward completion of the crimes of possession and importation of cocaine. That no evidence shows Baptista verbally assented to the scheme is not dispositive. An illegal agreement may be inferred from the conspirators' conduct and other circumstantial evidence. *See, e.g., United States v. LaSpesa,* 956 F.2d 1027, 1035 (11th Cir.1992); *United States v. Church,* 955 F.2d 688, 695 (11th Cir.), *cert. denied,* — U.S. ——, 113 S.Ct. 233, 121 L.Ed.2d 169 (1992). Baptista's assertions notwithstanding, the evidence against him proves more than "mere" presence. Baptista was identified as one of the "boat people" responsible for the transshipment of the cocaine into the United States. In addition, he was present on *several occasions* at key meetings of the conspirators. Presence is a material and probative factor which the jury may consider in reaching its verdict. *Kincade,* 714 F.2d at 1065. It is highly unlikely that conspirators attempting a 500-kilogram smuggling operation would have tolerated the *recurrent* presence of a mere bystander, especially during the operational stage of the scheme. *See Khoury,* 901 F.2d at 962 ("[W]here large quantities of drugs are present, 'a prudent smuggler is not likely to suffer the presence of unaffiliated bystanders....'") (quoting *United States v. Cruz-Valdez,* 773 F.2d 1541, 1547 (11th Cir. 1985), *cert. denied,* 475 U.S. 1049, 106 S.Ct. 1272, 89 L.Ed.2d 580 (1986)). Thus, we hold that the evidence was constitutionally adequate to support Baptista's conviction.

### VII.

For the reasons stated above, the judgments of conviction against Ramon Calvo and Juan Baptista-Rodriguez are AFFIRMED. The judgment of conviction against Julio Diaz is REVERSED. The Diaz matter is REMANDED to the district court for further proceedings consistent with this opinion.