UNITED STATES of America

v.

Duane HOLLAND, Daniel Hill, Donnie Montgomery, Duane Carroll, Pirrie Coates, Kevin Jones and James Deberry.

Crim. No. AMD 96–0399.

United States District Court, D. Maryland.

Nov. 4, 1997.

Martin Clarke, Christine Manuelian, Asst. U.S. Attys., Baltimore, MD, for U.S.

Cyril V. Smith, Baltimore, MD, Charles G. Bernstein, Baltimore, MD, for Duane Holland.

Harold I. Glaser, John S. Deros, Baltimore, MD, for Daniel Hill.

Godwin Oyewole, Washington, DC, for Pirrie Coates.

Thanos Kanellakos, Baltimore, MD, for Kevin Jones.

Jane C. Norman, Washington, DC, for Duane Carroll.

Frederick J. Sullivan, Bowie, MD, for Donnie Montgomery.

Donald Feige, Baltimore, MD, for James Deberry.

## MEMORANDUM

DAVIS, District Judge.

The indictment in this case arises out of an alleged heroin and crack cocaine ("crack") conspiracy which included among its members the named defendants between May 1992 and March 1997. The conspiratorial acts allegedly included murder, use of firearms and recruitment of minors for drug distribution.[1] Pending before the court are motions to dismiss based upon asserted violations of the Double Jeopardy clause, destruction of evidence, preindictment delay and "failure to state essential facts"[2], as well as motions to suppress physical evidence, motions to suppress statements, motions to sever, the government's *ex parte* motion for a protective order, and miscellaneous other motions. On September 29 and October 1, 1997, the court held an evidentiary hearing, and all counsel were heard in argument. Certain tentative and preliminary rulings were announced during and at the conclusion of the hearing. This memorandum sets out in full those rulings and the reasons therefor.

### I. Facts

The parties' moving papers, as supplemented by certain discovery documents, the record of other proceedings in this court and the proffers of counsel and the testimony taken at the hearing, support the following account of the factual background underlying this case. On February 7, 1993, Antonio Woodson ("Woodson") was shot and killed in the 2300 block of Nevada Street in Baltimore after he allegedly attempted to rob a drug dealer. Detectives with the Baltimore City Police Department ("Baltimore police") investigated the killing and soon arrested defendant Duane Holland ("Holland"). Although Holland was indicted by a state grand

---

**1.** The second superseding indictment ("indictment"), filed September 18, 1997, charges all defendants with conspiracy to distribute and possess with intent to distribute ("PWID") heroin and crack cocaine in violation of 21 U.S.C. § 846 between May 1992 and March 5, 1997 (count 1). Against Holland and Montgomery, the indictment also charges PWID crack, 21 U.S.C. § 841(a)(1) (count 10) and PWID crack within proximity of a playground and school, 21 U.S.C. § 860 (count 11) on February 8, 1996. Against Holland and Hill, the indictment charges distribution of crack, 21 U.S.C. § 841(a)(1) (count 7) and distribution of crack within proximity of a school, 21 U.S.C. § 860 (count 8) on September 15, 1994, as well as use of a juvenile to distribute narcotics, 21 U.S.C. § 861(a)(1) (count 12) in November 1992 and continuing criminal enterprise ("CCE"), 21 U.S.C. § 848(a)(counts 3 and 6, respectively). Hill is also indicted for felon in possession of a firearm, 18 U.S.C. § 922(g) (count 13) on February 25, 1997. Holland is indicted for murder in a drug conspiracy, 21 U.S.C. § 848(e)(1)(A) (count 2), murder in a

CCE, 21 U.S.C. § 848(e)(1)(A) (count 4), and use of handgun during and in relation to a drug trafficking crime, 18 U.S.C. § 924(c)(1) (count 5) on February 7, 1991 as well as distribution of crack, 21 U.S.C. § 841(a)(1) (count 9) on October 6, 1994. The following chart [see page 604] may prove helpful:

**2.** Pirrie Coates ("Coates") moves to dismiss the indictment against him for failure to state essential facts and elements of the alleged conspiracy necessary to inform him of the charges against him and enable him to prepare a defense. The indictment states that Coates and others "distributed the heroin and cocaine on the street" and that "[o]n or about August 20, 1996, PIRRIE COATES provided DUANE CARROLL with 20 gelcaps containing heroin that CARROLL then gave to a confidential informant in exchange for $200 in U.S. currency." I find that the indictment sufficiently states the facts and elements of the alleged conspiracy on which the government will rely, and I shall deny Coates's motion to dismiss.

jury for Woodson's murder, the case was subsequently *nolle prossed* by the State's Attorney in 1993 for a lack of evidence.

Between July and October 1994, federal authorities undertook an investigation of Holland's alleged drug distribution activities in the Westport Housing Project ("Westport") area of South Baltimore, the scene of the Woodson murder. During this period, confidential informants working with the authorities ("CI") allegedly purchased crack from Holland and others.

On October 17, 1994, a storage locker, allegedly rented by defendant Daniel Hill ("Hill"), was searched pursuant to a federal search warrant, and the authorities seized approximately 78 grams of crack. Hill was arrested by federal authorities on a federal criminal complaint alleging conspiracy and distribution of crack occurring on October 6, 1994. Six weeks later, on November 17, 1994, Hill was indicted by a grand jury in this District. Count one of the indictment charged him with conspiracy to distribute and possession with intent to distribute crack between July 1994 and October 19, 1994; count two charged him with possession with the intent to distribute crack on October 17, 1994, the date of the seizure of the 78 grams from the rented locker.

Plea negotiations between the Assistant United States Attorney ("AUSA") and defense counsel led to the AUSA contacting then Baltimore City Assistant State's Attorney Martin Clarke ("Clarke") (who has since joined the United States Attorney's Office and is one of the AUSAs prosecuting the instant case) to determine if he would be interested in prosecuting the case in state court. After discussions among the AUSA, Clarke, Hill and defense counsel, an oral agreement was reached whereby Hill would plead guilty in state court to state felonies for a six year sentence. Hill entered guilty pleas on February 2, 1995, in the Circuit Court for Baltimore City, to distribution of cocaine and conspiracy to distribute cocaine on October 6, 1994; he received the anticipated six year sentence. Fifteen days later, on February 17, 1995, the federal indictment was dismissed.

Apparently, there was an extended hiatus as to any federal interest in on-going narcotics distribution activity in the Westport area during 1995. It is not entirely clear as to what the level of state interest might have been in 1995, although it is clear that local law enforcement officers were active to some degree in the area.

In any event, on February 8, 1996, Baltimore police executed a state search warrant at 2628 Maisbury Court in Westport. During execution of the warrant, Detective Anthony Barksdale ("Barksdale") allegedly observed Holland hand a clear bag to defendant Donnie Montgomery ("Montgomery"), and heard Holland tell Montgomery to flee. Montgomery allegedly ran upstairs and threw the bag into a second floor bathroom. The house was secured, and Baltimore police took photos of the interior of 2628 Maisbury Court before and after the search. As a result of the search, Baltimore police allegedly seized, among other items, 83 ziplock bags of crack from the second floor bathroom. Although others were present at 2628 Maisbury Court, only Holland and Montgomery were arrested by Baltimore police.

Federal agents were informed of the February 8, 1996, seizure of crack, and in the summer of 1996, after a witness came forward with additional information, the FBI decided to adopt the case. A federal grand jury investigation was initiated.

On August 20, 1996, a CI allegedly purchased 20 gelcaps of heroin from defendants Duane Carroll ("Carroll") and Pirrie Coates ("Coates"). Two months later, on October 23, 1996, Carroll and Coates were indicted in this District for distribution of heroin. Count one of the indictment charged both Carroll and Coates with distribution of heroin on August 20, 1996; count two charged Carroll with distribution of cocaine on September 25, 1996. The case was tried before the Honorable Herbert N. Maletz and a jury from January 6 through 8, 1997. Evidence of a conspiracy involving Carroll, Coates and others (including Holland) was introduced by the government in an attempt to provide an evidentiary foundation for the introduction of audiotapes said to contain statements of co-conspirators. Ultimately, Coates was acquit-

ted of the August 20, 1996, distribution charge upon the granting of a motion for judgment of acquittal at the conclusion of the government's case; Carroll, however, was convicted and sentenced to 33 months imprisonment as to both counts, to be served concurrently. *U.S. v. Carroll,* 966 F.Supp. 392, 394 (D.Md.1997) (granting departure under Sentencing Guidelines and refusing to sentence Carroll as a career offender) (Maletz, S.J.). Prior to Carroll's sentencing, Carroll and Coates were indicted for conspiracy in the instant case.

Meanwhile, on December 10, 1996, (upon return of the original one-count indictment in this case) Holland's counsel and AUSA Gregory Welsh entered into a discovery agreement. On December 18, 1996, Holland's counsel requested in writing that the government produce all photographs taken at 2628 Maisbury Court, which were referred to in documents produced to Holland in discovery. On January 7, 1997, Holland's counsel again requested, in writing, that the photographs be provided. By letter dated January 16, 1997, AUSA Clarke advised defense counsel that "[y]ou may call Detective Anthony Barksdale of the Baltimore City Police ... to arrange a mutually agreeable time to view the photographs of the house where you [sic] client was arrested." Upon receipt of the letter, Holland's counsel contacted AUSA Clarke and asked whether the government could provide copies of the photographs, as they were important to the preparation of Holland's defense. Holland's counsel informed AUSA Clarke that the house in question had been reclaimed by the Housing Authority and was "boarded up." AUSA Clarke indicated that he would ask Baltimore police if copies could be provided. On January 21, 1997, AUSA Clarke telephoned defense counsel and stated that the photographs and the negatives had at all times been in the possession of the Baltimore police but were lost.

On March 5, 1997, a federal search warrant was executed at 1669 Vincent Court, which was allegedly the residence of defendant Daniel Hill. A 9mm handgun, a scale with cocaine residue, and an empty gelcap were recovered.

Additional facts are provided as appropriate below.

## II. Double Jeopardy

Carroll and Coates argue that the instant prosecution for conspiracy to distribute and conspiracy to possess with the intent to distribute heroin and crack violates the Double Jeopardy Clause of the Fifth Amendment in that it is effectively a reprosecution of the same charges involved in the January 1997 trial before Senior Judge Maletz. Hill argues, in a related fashion, that the instant prosecution violates the Double Jeopardy Clause because it is a reprosecution of the charges which were dismissed against him in federal court, in connection with which he pleaded guilty to state charges in state court in 1995.

(i)

The Double Jeopardy Clause of the Fifth Amendment provides that no person shall "be subject for the same offense to be twice put in jeopardy of life or limb." It provides protection both against cumulative punishments and against successive prosecutions, while providing criminal defendants with a measure of finality. *Brown v. Ohio,* 432 U.S. 161, 165, 97 S.Ct. 2221, 2225, 53 L.Ed.2d 187 (1977).

▄ In a jury trial, jeopardy attaches when the jury is sworn; in a bench trial, jeopardy attaches when the first witness is sworn. *Crist v. Bretz,* 437 U.S. 28, 35, 98 S.Ct. 2156, 2160–61, 57 L.Ed.2d 24 (1978). Even if jeopardy attaches in one court, the dual sovereignty doctrine permits consecutive prosecutions by state and federal authorities for criminal violations arising from the same conduct. *Heath v. Alabama,* 474 U.S. 82, 88, 106 S.Ct. 433, 437, 88 L.Ed.2d 387 (1985).

▄ The only recognized exception to the dual sovereignty doctrine is the "sham prosecution" exception. The Supreme Court alluded to this exception and courts have subsequently addressed it. *See, e.g., Bartkus v. People of State of Ill.,* 359 U.S. 121, 79 S.Ct. 676, 3 L.Ed.2d 684 (1959); *U.S. v. Bernhardt,* 831 F.2d 181 (9th Cir.1987); *U.S. v. Baptista–Rodriguez,* 17 F.3d 1354 (11th Cir.1994);

U.S. v. Byars, 762 F.Supp. 1235 (E.D.Va. 1991); U.S. v. Jordan, 768 F.Supp. 144 (E.D.Pa.1990). In order to come within this narrow exception, a "defendant must show that one sovereign was so dominated, controlled or manipulated by the actions of the other that it did not act of its own volition" and that it was merely a tool of the other. Baptista–Rodriguez, 17 F.3d at 1361. The facts must establish that the second prosecution was a cover to conceal some objective of the other sovereign, making the second prosecution, in effect, a prosecution by the other sovereign. Id.

(ii)

■ Coates and Carroll argue that their 1997 federal prosecution for distribution of heroin on August 20, 1996, against both defendants, and distribution of cocaine on September 25, 1996, against Carroll only, bars the instant prosecution for conspiracy.

■ When the jury was sworn in the January 1997 trial, jeopardy attached to the charges alleged in that trial. Although evidence of a conspiracy involving Carroll, Coates and others (including Holland) was presented to the jury at trial to provide the government with an evidentiary foundation for the introduction of audiotapes, neither Carroll nor Coates was indicted or tried in January 1997 for conspiracy under 21 U.S.C. § 846, the charge in the instant case. Although I am cognizant that much of the evidence presented in their 1997 trial likely will be presented against them in the trial of the instant case, I am aware of no authority to support defendants' argument that proof of a conspiracy, tendered in an attempt to establish a "concerted action" evidentiary foundation in the trial of substantive offenses, precludes subsequent prosecution for the conspiracy. Furthermore, it is well-settled that evidence of a finally adjudicated substantive offense is not inadmissible under the Double Jeopardy clause if it is offered as proof of an overt act committed in furtherance of a conspiracy charged in a . subsequent prosecution. See U.S. v. Felix, 503 U.S. 378, 380–81, 112 S.Ct. 1377, 1379–80,

118 L.Ed.2d 25 (1992) (Oklahoma federal prosecution for conspiracy to manufacture, possess and distribute methamphetamine was not barred on double jeopardy grounds by prior Missouri federal prosecution and conviction for attempting to manufacture an illegal drug, despite that evidence of Missouri activity comprised some of overt acts of Oklahoma conspiracy); U.S. v. Bayer, 331 U.S. 532, 542, 67 S.Ct. 1394, 1399, 91 L.Ed. 1654 (1947) (federal prosecution for conspiracy to defraud the government was not barred on double jeopardy grounds by prior prosecution and conviction in court-martial proceedings for discrediting the military service by accepting payments in return for transferring soldiers to noncombat units, despite that prosecutions were based on same underlying incidents). Accordingly, despite the seeming unfairness to the defendants inherent in running the gauntlet a second time in such closely-related prosecutions, I must deny defendants' motions to dismiss.

(iii)

■ Hill argues that the 1994 federal prosecution and related guilty pleas in state court bar the instant prosecution based upon double jeopardy. However, no jury or witness was ever sworn in a trial of the 1994 federal charges, and Hill did not enter a guilty plea in federal court or otherwise enter into a binding agreement, covering the charges alleged in this case, with the federal authorities in 1994.[3] Thus, I find as a matter of law that jeopardy did not attach in respect to‸the 1994 federal prosecution of Hill, and Hill can claim no immunity from prosecution as to the charges in the case at bar.

■ Hill is now being prosecuted in federal court for conspiracy involving overt acts, including distribution of crack to a CI on October 6, 1994, and possession of 78 grams of crack seized from the storage locker on October 17, 1994. In state court, Hill pleaded guilty to the substantive offense of distribution of cocaine alleged to have occurred on October 6, 1994. The 1994 federal indictment, which included one count of PWID

---

**3.** At the hearing on this issue, defense counsel specifically indicated that Hill's motion to dismiss is not based on any alleged violation of the 1994 agreement.

crack in the storage locker on October 17, 1994, was dismissed.[4] Thus, Hill is currently charged with a conspiracy involving one overt act to which he pleaded guilty in state court, and another such overt act which the federal government dismissed in 1995.

Hence, although the instant conspiracy charge is based in part on the same conduct to which Hill pleaded guilty in state court in 1995, I find that the doctrine of dual sovereignty permits the prosecution of Hill in the instant indictment despite his guilty plea in state court in 1995. The Fourth Circuit has not definitively ruled on whether the "sham prosecution" exception is recognized in this circuit, and defense counsel in this case did not clearly argue for application of such an exception. Nevertheless, there has been no showing that Hill's 1995 state prosecution was so "dominated, controlled or manipulated" by federal prosecutors that the state became merely a tool of the federal government. While it is true that (1) the state prosecutor was informed of the case by the AUSA, (2) the state prosecutor likely received investigatory information and support from the federal government, (3) the AUSA indicated in writing her approval of the six year sentence, and (4) the AUSA withheld dismissal of the federal indictment until after the state court plea, this cooperation and communication between the federal and state authorities, which seems to have inured to Hill's benefit at the time [5], does not convert the state prosecution into a "mere tool" of the federal government. The state prosecutor was independent from the federal prosecutor, did not purport to represent the federal sovereign, was not funded by the federal sovereign and vindicated the separate interests of the state sovereign in prosecuting Hill. *Baptista–Rodriguez*, 17 F.3d at 1361. Although the federal and state authorities communicated and cooperated in their parallel prosecutions of Hill, that cooperation does not rise to the level of a sham prosecution. Thus, Hill's double jeopardy claim fails.

### III. Destruction of Evidence

Holland and Montgomery argue that the indictment against them should be dismissed because the government, acting in bad faith, lost or destroyed photographs of the interior of 2628 Maisbury Court taken after Baltimore police entered those premises with a search warrant and before execution of the search. Holland and Montgomery argue that the photographs are potentially exculpatory, cannot be obtained from other sources, and that an inference of bad faith can and should be drawn from the circumstances surrounding the disappearance of the photographs.

In two cases, the Supreme Court has articulated a test for determining whether the government's failure to preserve evidence constitutes a violation of the Due Process Clause of the Fifth Amendment. *California v. Trombetta*, 467 U.S. 479, 104 S.Ct. 2528, 81 L.Ed.2d 413 (1984); *Arizona v. Youngblood*, 488 U.S. 51, 109 S.Ct. 333, 102 L.Ed.2d 281 (1988). Under the *Trombetta* test, the government violates a defendant's right to due process when it destroys evidence whose exculpatory significance is apparent before destruction, and the defendant is unable to "obtain comparable evidence by other reasonably available means." *Trombetta*, 467 U.S. at 489, 104 S.Ct. at 2534.[6] In *Young-*

---

**4.** Hill asserts that the 1994 federal prosecution and state prosecution were, in effect, the same prosecution. Although Hill was arrested by federal authorities in 1994 on a criminal complaint alleging conspiracy and distribution of crack occurring on October 6, 1994 (the offenses to which he pleaded guilty in state court), six weeks after his arrest and several months before his state court plea, he was indicted by a federal grand jury for conspiracy to distribute and PWID crack between July 1994 and October 19, 1994, and for PWID crack on October 17, 1994. Thus, it is clear that Hill's pretermitted 1994 federal prosecution and the 1995 state court guilty plea literally addressed distinct conduct. Even if the conduct were the same, however, the outcome of

my analysis, as set forth in text, would also be the same.

**5.** Hill likely would have received a substantially longer, no-parole sentence, had he been convicted in federal court.

**6.** As stated in text, to warrant dismissal, a defendant must show that he is unable to obtain comparable evidence by other reasonably available means. *Trombetta*, 467 U.S. at 489, 104 S.Ct. at 2534. The defendant has made such a showing. The tenant present at 2628 Maisbury Court on February 8, 1996, no longer lives at that address and the residence is currently "boarded up." Although the government provided defense coun-

*blood,* the court extended *Trombetta* to provide that if the exculpatory value of the evidence is indeterminate and all that can be confirmed is that the evidence was "potentially useful" for the defense, then the defendant must show that the government acted in bad faith in destroying the evidence. *Youngblood,* 488 U.S. at 58, 109 S.Ct. at 337–338.

■ "The presence or absence of bad faith by the police for purposes of the Due Process Clause must necessarily turn on the police's knowledge of the exculpatory value of the evidence at the time it was lost or destroyed." *Youngblood,* 488 U.S. at 56–57 n. *, 109 S.Ct. at 336 n. *. *See also U.S. v. Cooper,* 983 F.2d 928, 931–932 (9th Cir.1993) (destruction of laboratory equipment allegedly used by defendant to manufacture methamphetamine violated due process where evidence was destroyed after notice to government of defendant's claim that the lab was legitimate and defendant was unable to obtain comparable exculpatory evidence by other reasonably available means); *U.S. v. Bohl,* 25 F.3d 904, 911–913 (10th Cir.1994) (destruction of potentially exculpatory metal tower legs violated due process where defendant repeatedly requested access to tower legs, grand jury testimony of agent clearly showed that towers were within government's control subsequent to defendant's request for them, government asserted no innocent reason for destruction of the evidence, and the potentially exculpatory value of the evidence was not merely conclusory and was corroborated by other evidence).

■ Holland asks this Court to infer bad faith and, indeed, intentional wrongdoing, from the circumstances surrounding Holland's requests for the photographs, the government's responses, and Barksdale's and Special Agent Michael L. Harrigan's ("Agent Harrigan") allegedly conflicting pre-trial testimony. Holland argues that because the photographs were only reported lost after defense counsel's repeated written and oral

requests indicated their importance to Holland's defense to AUSA Clarke, bad faith should be inferred. As I indicated on the record at the hearing, however, I find that the loss of the photographs does not amount to more than negligence on the part of the officer.

Barksdale testified that the photographs were developed by the Baltimore police crime lab, all of the photographs and negatives were returned to him in one envelope, and no copies of the photographs or negatives were made, all of which is consistent with Baltimore police procedure. He then stapled the envelope containing the photographs to the inside of his case folder, which also contained the statement of charges, search warrant, statement of probable cause, offense reports and drug analysis. The case folder was kept in a cabinet in the hallway of the office. He indicated that the last day that he knows he had the file, with the photographs in an envelope stapled to the inside, was the day of the preliminary hearing in state court in March 1996. Barksdale testified that after the hearing, he took the folder back to his office, but does not know if the folder was ever filed away or what happened to it after he took it back to his office.

Around the time of Holland's October 1996 arrest on federal charges, Barksdale spoke with Agent Harrigan and indicated to him that he had the case folder. Barksdale assumed that the case folder had been properly filed at his office. When he later went to retrieve the case folder containing the photographs, it was not in the filing cabinet. Despite his search of the office, filing cabinet, areas of the state courthouse where the preliminary hearing was held and the state's attorney's office, Barksdale was unable to locate the case folder and photographs.

When Barksdale could not find the case folder and photographs, he informed Agent Harrigan. Barksdale was able to obtain duplicate copies of all of the documents in the file, except the photographs. Barksdale pro-

---

sel with photographs of the vacant interior of 2628 Maisbury Court taken sometime subsequent to February 8, 1996, these photographs do not depict, as no photographs other than the missing photographs can, the appearance of the interior

of the residence on February 8, 1996, after the entry of police officers and before the search of the residence. Thus, Holland and Montgomery have established this element of their claimed due process violation.

vided those duplicates to Agent Harrigan. Prior to meeting AUSA Clarke, Barksdale told Agent Harrigan that he did not, in fact, have the photographs. At some point after he had advised Harrigan that the photographs were lost, AUSA Clarke advised Barksdale that the photographs were important to Holland's defense counsel.

After careful consideration of the evidence and arguments of counsel, I decline to infer from the circumstances that the government acted in bad faith with respect to the photographs. Barksdale's conduct, while negligent and slipshod, does not demonstrate bad faith. There is no evidence suggesting that the photographs were deliberately destroyed by Barksdale or anyone else. In fact, the entire case folder, not just the photographs, has not been seen since March 1996. Furthermore, it is unclear when the photographs were actually lost; the rather wide window shown by the evidence is that they were lost between March 1996 and January 21, 1997. There is no evidence that Barksdale knew of the importance of the photographs when they were lost. To the contrary, Barksdale's testimony showed that he, the only government agent ever to possess the photographs, did not even learn of the importance of the photographs to the defense from Clarke until *after* he had already reported to Agent Harrigan that the photographs were missing. Until his discussion with Clarke, for all Barksdale knew, the photographs were critical and necessary to the government's case.

Holland suggests that Clarke's January 16, 1997, letter shows that the photographs existed at that time and were only "lost" after that date and after defense counsel's two written requests for the photographs. Although Clarke's letter refers defense counsel to Barksdale to set up a time to view the photographs, implying that the photographs exist, I do not infer from the letter that Clarke had determined from Barksdale that the photographs were actually in Barksdale's possession on January 16, 1997, or that Barksdale actually knew the location of the photographs at that time.

Moreover, Holland presents no more than speculation and conjecture regarding what the photographs would show. Holland argues that *if* the photographs depict the exact location of the front door of the residence after Barksdale broke the door off of its hinges in executing the search warrant, in relation to the exact location of the furniture inside the residence, they could be relevant to a jury's determination of the credibility of Barksdale's testimony regarding whether or not he could have observed Holland pass a bag containing crack to Montgomery, who allegedly then ran upstairs with the bag and threw it into a second floor bathroom. To persuade the court that the photographs have genuine value, Holland must base his assertion of the content and value of the photographs, however, on more than mere speculation and conjecture. It is simply unknown whether the photographs were even developed properly or if they were dark or blurry, from what angle they were taken or if any of them even depicted the living room or the downed door in relation to the stairs and couch. At bottom, the content of the photographs is the subject of mere speculation. While I recognize that counsel for Holland cannot be expected to describe a photograph that he has never seen, there is absolutely no corroboration in the record to show that the photographs would depict the front door in contact with the couch in the manner suggested by Holland. Absent more than mere speculation and conjecture, dismissal of the indictment for loss of the photographs is not warranted. Moreover, even if the photographs show what Holland speculates they would show, the usefulness of the photographs at trial would extend only to the credibility of Officer Barksdale's testimony and the weight of the evidence.

## IV. Preindictment Delay

Holland moves for dismissal of the counts of the indictment alleging murder (counts two and four) for excessive preindictment delay in violation of the Due Process Clause of the Fifth Amendment. Holland argues that there is no justification for the government's four-and-one-half year delay in prosecuting Holland for the February 7, 1993, murder of Woodson, and that Holland is prejudiced by the death of Howard Horton ("Horton"), one of the drug dealers whose attempted robbery by Woodson led to Wood-

son's murder. Holland alleges that if he was alive, Horton would testify that he, and not Holland, shot and killed Antonio Woodson. Holland argues that Horton would likely testify in this fashion because Horton shot at Woodson only in self-defense.

Carroll also moves for dismissal on the basis of preindictment delay. He seems to argue that the delay in prosecuting him in the instant case (until after his trial and conviction in January 1997 for closely-related substantive offenses) prejudices Carroll, because his sentence will be enhanced by the January 1997 convictions if he is convicted in this case.

### (i)

■■■ The Fifth Amendment due process clause provides a basis for dismissal of an indictment for excessive preindictment delay. *United States v. Marion*, 404 U.S. 307, 324, 92 S.Ct. 455, 465, 30 L.Ed.2d 468 (1971). The Fourth Circuit has adopted a two-pronged test to evaluate claims of excessive preindictment delay. *Howell v. Barker*, 904 F.2d 889, 895 (4th Cir.1990), *cert. denied*, 498 U.S. 1016, 111 S.Ct. 590, 112 L.Ed.2d 595 (1990); *see also Jones v. Angelone*, 94 F.3d 900 (4th Cir.1996).[7] Under this test, the defendant has the burden of showing actual prejudice. Prejudice is shown when a defendant is "meaningfully impaired in his ability to defend against the state's charges to such an extent that the disposition of the criminal proceeding was likely affected." *Jones*, 94 F.3d at 907. If the requisite prejudice is shown, the court must then balance the defendant's prejudice against the government's justification for the delay. *Howell*, 904 F.2d at 895 (citing *U.S. v. Automated Medical Laboratories, Inc.*, 770 F.2d 399, 403 (4th Cir.1985)). "The basic inquiry then becomes whether the government's action in prosecuting after substantial delay violates

'fundamental conceptions of justice' or 'the community's sense of fair play and decency.'" *Automated Medical Laboratories, Inc.*, 770 F.2d at 404 (citations omitted).

Continuing investigation has been recognized as a valid reason for delay, despite some prejudice. *U.S. v. Lovasco*, 431 U.S. 783, 97 S.Ct. 2044, 52 L.Ed.2d 752 (1977). In *Lovasco*, there was an 18 month delay between the offense and indictment for possession of stolen firearms during which two defense witnesses died.[8] The government attempted to justify the delay by arguing that Lovasco's son was responsible for the theft and "further investigation to establish this fact was important." *Id.* at 787, 97 S.Ct. at 2047. The government conceded that the "investigation did not continue on a full time basis, [but] there was contact between the United States Attorney's office and the Postal Inspector's office throughout...." *Id.* In reversing, the Supreme Court stated:

In our view, investigative delay is fundamentally unlike delay undertaken by the Government solely "to gain tactical advantage over the accused," precisely because investigative delay is not so one-sided. Rather than deviating from elementary standards of "fair play and decency," a prosecutor abides by them if he refuses to seek indictments until he is completely satisfied that he should prosecute and will be able promptly to establish guilt beyond a reasonable doubt. Penalizing prosecutors who defer action for these reasons would subordinate the goal of "orderly expedition" to that of "mere speed." This the Due Process Clause does not require. We therefore hold that to prosecute a defendant following investigative delay does not deprive him of due process, even if his defense might have been somewhat prejudiced by the lapse of time.

---

7. With the exception of the Fourth and Ninth Circuits, every other Circuit has held that "in order to establish that a lengthy pre-indictment delay rises to the level of a due process violation, a defendant must show not only actual substantial prejudice, but also that 'the government intentionally delayed the indictment to gain an unfair tactical advantage or for other bad faith motives.'" *Jones*, 94 F.3d at 905 (quoting *U.S. v. Crooks*, 766 F.2d 7, 11 (1st Cir.1985), *cert. denied*, 474 U.S. 996, 106 S.Ct. 421, 88 L.Ed.2d 362

(1985)). The Fourth Circuit's standard requires less.

8. In *Lovasco*, the Court specifically noted that Lovasco, "did not state how the [missing] witnesses would have aided the defense had they been willing to testify." *Lovasco*, 431 U.S. at 786, 97 S.Ct. at 2046–47. However, the Court went on to address the reasons offered by the government for the delay.

**598**

*Id.* at 795–796, 97 S.Ct. at 2051–2052 (citations omitted).

██ However, "mere inconvenience" or prosecutorial negligence does not constitute sufficient justification for preindictment delay. *Howell,* 904 F.2d at 895 (affirming grant of writ of habeas corpus where state of North Carolina delayed serving arrest warrant for over two years in order to avoid inconvenience of transporting defendant while he was prosecuted by jurisdiction on separate charge and state did not assert that the case was overly complicated or that the state engaged in preindictment investigation).

(ii)

██ Under the Fourth Circuit's two-pronged test for excessive preindictment delay, a defendant must first show excessive preindictment delay resulted in actual prejudice.[9] The prejudice alleged in this case is the inability to call Horton, who would supposedly admit to killing Woodson, under oath, on the record, in a public proceeding. Although some government witnesses have indicated that Horton was being robbed by Woodson, and the indictment itself states "on or about February 7, 1993, HOWARD HORTON, a/k/a/ 'Binky,' shot at and wounded Antonio Woodson in retaliation for being robbed by Woodson of a quantity of heroin," the evidence also indicates, apparently, that it was Holland who chased down Woodson and discharged the *fatal* shots. Furthermore, there is no independent corroboration that Horton would in fact testify that he, and not Holland, delivered the fatal shots.[10] I am

asked simply to rely on Holland's self-serving indication of what Horton would say. I find it unlikely that Horton, who was not originally charged, would confess to a killing, risking subsequent prosecution, even if he did have available to him the suggested defense of self-defense. If Horton would actually have testified as Holland indicates, the preindictment delay would result in prejudice to Holland, of the most profound sort.[11] Absent sufficient corroboration that Horton would have testified as Holland suggests, however, I find insufficient prejudice to warrant dismissal of the indictment.

Even if the inability of Horton to testify for Holland amounted to actual prejudice, however, before dismissing the indictment, the Court would have to balance the prejudice to Holland against the government's justification for the delay. Here the government's justification for delay is that it lacked sufficient evidence to prosecute Holland for the murder counts until a previously unknown witness came forward in the spring of 1996. The government has supported its contention that the witness's testimony is material and previously unknown by submitting, *ex parte,* at my request, grand jury testimony of the previously unknown witness, and investigation-related documents created before the discovery of the witness which identified witnesses known prior to discovery of the new witness in the spring of 1996.[12] Having reviewed the *ex parte* submissions, I find that the government's justification for delay in prosecuting Holland for murder is justified.

9. Because Horton was killed in November 1994, arguably the only relevant delay is the twenty-two months between the February 1993 killing and Horton's death.

10. Independent corroboration could take the form, for example, of testimony or an affidavit of an individual to whom Horton confessed that he had actually killed Woodson.

11. It should be noted, as my colloquy with counsel at the hearing disclosed, the precise time at which the United States (in contrast to a state) develops a cognizable interest is what appears to be an all-too-routine street murder, is problematic at best. It requires no citation to authority for the proposition that the United States Attorney in a federal judicial district has no interest in prose-

cuting a murder absent a clear federal nexus. Thus, preindictment delay in a case of this sort is sui generis. I need not explore these issues, however, for the reasons expressed in text.

12. While I do not retreat from my position that the *ex parte* submissions were useful and necessary to the Court, I absolutely do not intend to create any procedure which would require the government to provide grand jury testimony to a court in any other case, nor do I intend that my actions here be used in the future as a reference for what is required of the government faced with a motion to dismiss based upon preindictment delay.

As the Supreme Court stated in *Lovasco,* "[r]ather than deviating from elementary standards of 'fair play and decency,' a prosecutor abides by them if he refuses to seek indictments until he is completely satisfied that he should prosecute and will be able promptly to establish guilt beyond a reasonable doubt." *Lovasco,* 431 U.S. at 795–796, 97 S.Ct. at 2051. I find that the government's failure to prosecute Holland for the Woodson murder prior to discovery of the new witness comports with "fundamental concepts of justice" and "the community's sense of fair play and decency." For the foregoing reasons, I find the suggested prejudice speculative and the justification for the government's delay completely valid, and I shall deny Holland's motion to dismiss.

(iii)

 Carroll alleges that the delay in prosecuting him in the instant case permitted the government to convict him of substantive offenses in January 1997, which in turn will prejudice Carroll by enhancing his penalty under the sentencing guidelines if convicted in this case. Carroll's argument is not a preindictment delay argument; the prejudice alleged by Carroll does not "meaningfully impair[ ] his ability to *defend against the state's charges.*" *Jones,* 94 F.3d at 907. Carroll does not argue that his ability to defend against the government's charges is impaired by his prior conviction. Rather, he argues that his penalty would be enhanced if he is convicted. Carroll's argument should be appropriately fashioned and raised at sen-

tencing *if* Carroll is convicted.[13] Thus, I shall deny Carroll's motion to dismiss based upon preindictment delay.

## V. Motions to Suppress Physical Evidence

Holland and Montgomery move to suppress the physical evidence seized at 2628 Maisbury Court on February 8, 1996, pursuant to a state-authorized search warrant.[14] The threshold issue presented is whether Holland and Montgomery have standing to challenge the search.

 In order to establish standing, a defendant must show that "his own Fourth Amendment rights were violated by the challenged search or seizure." *Rakas v. Illinois,* 439 U.S. 128, 132 n. 1, 99 S.Ct. 421, 424 n. 1, 58 L.Ed.2d 387 (1978). Whether a person has a constitutionally protected reasonable expectation of privacy depends on whether the person manifested a subjective expectation of privacy in the place searched, and, if so, whether society is willing to recognize the expectation as reasonable. *California v. Ciraolo,* 476 U.S. 207, 211, 106 S.Ct. 1809, 1811–1812, 90 L.Ed.2d 210 (1986)(discussing *Katz v. United States,* 389 U.S. 347, 360, 88 S.Ct. 507, 516, 19 L.Ed.2d 576 (1967)). A person's claim that he was legitimately on the premises at the time of the search is an insufficient legal basis by itself for the court to initiate a review of the propriety of the search. *Minnesota v. Olson,* 495 U.S. 91, 97, 110 S.Ct. 1684, 1688, 109 L.Ed.2d 85 (1990), (cit-

---

**13.** The Sentencing Guidelines expressly allow district courts to give sentencing credit for undischarged terms of imprisonment "result[ing] from offense(s) that have been fully taken into account in the determination of the offense level of the instant offense." *U.S. v. McHan,* 101 F.3d 1027, 1040 (4th Cir.1996) (quoting U.S.S.G. § 5G1.3). However, a downward departure may not be applied by the district court if the sentence for the predicate conduct of the conspiracy conviction has already ended. Thus, whether this court may consider a downward departure if Carroll is convicted of conspiracy will turn on whether or not the 33 month sentence imposed by Senior Judge Maletz has ended. The government has sought appellate review of Judge Maletz's decision to grant a downward departure.

**14.** Montgomery filed a motion to suppress evidence, namely, an automatic handgun, seized

from a 1988 Nissan Maxima on February 8, 1996. Although the government has not responded to this motion in its written opposition, because Montgomery did not argue this motion at the hearing held September 29 and October 1, 1997, it could be deemed waived. Nonetheless, I shall await the up-coming hearing to determine whether Montgomery desires to pursue this issue.

Hill filed a generic motion to suppress physical evidence. As Hill's counsel indicated at the September 29, 1997, motions hearing, Hill has not received from the government the affidavit for the search warrant executed on March 5, 1997. As a result, Hill cannot possibly be specific regarding his motion to suppress. Accordingly, I will defer ruling on Hill's motion to suppress physical evidence until he is provided with the affidavit and given an adequate opportunity to be heard on his motion.

ing *Rakas*, 439 U.S. at 142–148, 99 S.Ct. at 429–433). Although an overnight guest has a reasonable expectation of privacy in the host's residence, *Olson*, at 96–97, 110 S.Ct. at 1687–1688, a "purely transient party guest," *U.S. v. Maddox*, 944 F.2d 1223, 1224 (6th Cir.1991), *cert. denied*, 502 U.S. 992, 112 S.Ct. 610, 116 L.Ed.2d 633 (1991), or a "casual, transient visitor," *U.S. v. McNeal*, 955 F.2d 1067, 1070 (6th Cir.1992), *cert. denied*, 505 U.S. 1223, 112 S.Ct. 3039, 120 L.Ed.2d 908 (1992), does not have a reasonable expectation of privacy in the place searched.[15]

■ Although Montgomery once lived in Westport and Holland lived nearby, there is no evidence showing that Montgomery or Holland ever lived at or had any proprietary interest in 2628 Maisbury Court. None of their clothes or personal papers were found there, and no evidence was presented to show that Montgomery or Holland had a key to 2628 Maisbury Court on February 8, 1996. No evidence was presented to show that Montgomery or Holland had ever, much less on February 7, 1997, spent the night at 2628 Maisbury Court. To the contrary, Montgomery's pre-trial testimony made plain that he did not even know the house number of the residence, had been to the residence on only two or three previous occasions and had just arrived at 2628 Maisbury Court to "shoot craps" on February 8, 1996, when Baltimore police executed the warrant. Montgomery testified that he was present at the residence without the permission of the tenant, "Jo–Jo", or the owner, and that he had not been invited there; he was there because someone on the street told him that there was a craps game going on at the residence. Montgomery was at most a casual visitor to the residence who lacked any proprietary interest in 2628 Maisbury Court. Thus, I find that

Montgomery lacks standing to challenge the search in this case.

■ Holland relies on many of the government's documents in asserting that he had a reasonable expectation of privacy in 2628 Maisbury Court on February 8, 1996. Holland notes that in its consolidated response to defendants' motions, the government states that 2628 Maisbury Court "was believed to be a stash house used by Holland and other members of his organization." Govt. Consol Resp. at 2. Barksdale's search warrant affidavit further states that CI 936 informed him that "2628 Maisbury Court is a location were [sic] drugs (crack) is being distributed from and that black/males are running in and out of 2628 Maisbury Court constantly to resupply there [sic] outside stashes," and "Diddles" (i.e., Holland) is "the person controlling the drugs" at 2628 Maisbury Court. Aff. at 5. The affidavit further states that "[w]hile conducting ... surveillance Diddles would be observed standing on the porch of 2628 Maisbury Court," and when "a patrol car would pull up into the area [ ] all of the persons would walk briskly away in different directions and Diddles would be observe [sic] to go into 2628 Maisbury Court." *Id.* at 6. Also according to the affidavit, during January 1996, Holland "frequent[ed] 2628 Maisbury Court," *id.* at 6, and Holland was the person expected to be found at 2628 Maisbury Court. *Id.* at 1. Additionally, in his pre-trial testimony on a different issue, Barksdale testified that he knew Holland to frequent 2628 Maisbury Court.

Holland's reliance on the government's theory of the case and the assertions of Barksdale to support his claim of a reasonable expectation of privacy in 2628 Maisbury Court on February 8, 1996, is misplaced. The government's theory, based on Barksdale's information and belief, that Holland

**15.** Holland cites this Court to *Bonner v. Anderson*, 81 F.3d 472 (4th Cir.1996), wherein the Fourth Circuit recognized Bonner's standing in a 42 U.S.C. § 1983 action. In that case, Bonner was a frequent (non-overnight) visitor to the elderly homeowner, formerly lived in another building on the property, was on the premises the day of the execution of the search warrant to run errands for the elderly homeowner, and Bonner's half-sister was raised in the home. Significantly, the court noted that the reason Bonner

was on the premises was persuasive and "established an expectation of privacy that is 'recognized and permitted by society.'" *Bonner*, 81 F.3d at 475 (quoting *Olson*, 495 U.S. at 100, 110 S.Ct. at 1689–1690). Bonner is clearly distinguishable from the instant case; Bonner's legitimate reason for being present in the home was weighed heavily by the court in its determination that Bonner had standing in the context of a civil action for damages.

used 2628 Maisbury Court as a stash house, does not mean that the location was indeed Holland's stash house, or that, if so, he necessarily enjoyed a reasonable expectation of privacy therein. Holland cannot assert his proprietary interest and reasonable expectation of privacy in 2628 Maisbury Court through the government's pre-search theory and witnesses. *See U.S. v. Singleton,* 987 F.2d 1444 (9th Cir.1993) (holding that the district court erred by relying solely on the government's theory of the case in finding that Singleton had standing to contest search). The evidence before me shows that Holland was no more than a casual visitor to 2628 Maisbury Court, one of numerous players in a "floating" craps game, and does not established that he had a subjective expectation of privacy in 2628 Maisbury Court that society is prepared to recognize as reasonable.[16] Thus, I find that Holland lacks standing to challenge the search in this case.

Nevertheless, even if Holland and Montgomery had standing to challenge the search warrant in this case, they would not prevail. Holland and Montgomery argue that the search warrant contains a knowingly false statement that "CI # 936 is not a user of controlled dangerous substances" and without this comment bolstering CI 936's credibility, the issuing judge would not have had probable cause to authorize the search warrant. Their argument assumes that CI 936 is Vance Williams. The government responds that CI 936 is not Vance Williams. In any event, even if the statement that CI 936 is a non-user were false and purposely so, I find (with that assertion excised from the affidavit) the affidavit for the search warrant nonetheless contains a substantial basis supporting the issuing judge's decision to issue the search warrant. *See Franks v. Delaware,* 438 U.S. 154, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978); *U.S. v. Leon,* 468 U.S. 897, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984).

 Furthermore, I find that the knock-and-announce rule was not violated in this case. As the Supreme Court stated in *Richards v. Wisconsin,* —— U.S. ——, —— n. 7, 117 S.Ct. 1416, 1422 n. 7, 137 L.Ed.2d 615 (1997), "[t]he practice of allowing magistrates to issue no-knock warrants seems entirely reasonable when sufficient cause to do so can be demonstrated ahead of time." After reviewing the affidavit for the search warrant, which included Holland's criminal record and an assertion by the informant that Holland regularly protected his narcotics using firearms, the judge issuing the search warrant expressly authorized a no-knock entry into 2628 Maisbury Court, signing her name on the very page requesting no-knock entry. I decline to disturb the issuing judge's determination of the need for a no-knock entry.

For all of these reasons, the motions to suppress evidence seized at 2628 Maisbury Court shall be denied.

VI. Motions to Suppress Statements

Montgomery and Hill challenge the admission of their statements on the basis of their privilege against self-incrimination and right to counsel under the Fifth, Sixth and Fourteenth Amendments. Holland moves to suppress statements made to federal law enforcement officers on October 24, 1996, because the statements were obtained in violation of his Sixth Amendment right to counsel.

Holland was arrested on February 8, 1996, retained counsel and appeared at a preliminary hearing with counsel. Thereafter, the federal government, in cooperation with state officials, decided to prosecute the case. On October 24, 1996, state law enforcement officials, who knew that Holland had retained counsel, went with federal law enforcement officials to assist in the arrest on federal charges. After his arrest and upon presentation of an advice of rights form, Holland stated that "he would not make a statement" and that "he would not sign the form without his attorney." FBI Report attached to Holland's Mot. to Suppress at Ex. 8. Thereafter,

---

16. Even if this court were to consider the government's theory in support of Holland's assertion of standing, Holland would not prevail. Through its pleadings and the affidavit for the search warrant, the government indicates that 2628 Maisbury Court was believed to be Holland's stash house and was a location frequented by Holland. Considering this information along with the testimony presented at the hearing on this issue, Holland still has not established that he had a reasonable expectation of privacy in 2628 Maisbury Court on February 8, 1996.

Holland gave a statement regarding the allegations in the federal indictment, his prior involvement in alleged criminal conduct and his alleged status as a drug dealer.

The government's response to the motions of Holland and Montgomery states "the government will present no opposition to the Court's granting of the Defendants' motion to suppress statements, and an evidentiary hearing on this matter will not be necessary."[17] Govt. Resp. to Motion to Supp. Statements at 1. Based upon the failure of the government to oppose Holland's and Montgomery's motion to suppress statements, I find that Holland's and Montgomery's Sixth Amendment right to counsel had attached when they were questioned by federal and state agents on October 24, 1996, and I grant the defendants' motions to suppress their statements. Because the government indicates that there are no statements other then those given by Holland and Montgomery, Hill's motion to suppress is denied as moot.[18]

### VII. Motions for Severance[19]

Several defendants seek separate trials, and Hill argues that count 13 of the indictment, charging him with felon in possession of a firearm under 18 U.S.C. § 922(g)(1), should be severed from the trial of this case because presentation of Hill's prior felony conviction would be necessary to prosecution of that offense and would also result in undue prejudice to Hill. While I shall not sever defendants, I agree with Hill's contention regarding count 13.

"[T]here is a preference in the federal system for joint trials of defendants who are indicted together," *Zafiro v. U.S.*, 506 U.S. 534, 537, 113 S.Ct. 933, 936–937, 122 L.Ed.2d 317 (1993), and "[j]oinder is highly favored in conspiracy cases, over and above the general disposition towards joinder for reasons of efficiency and judicial economy," *U.S. v. Tedder*, 801 F.2d 1437, 1450 (4th Cir.1986), *cert. denied*, 480 U.S. 938, 107 S.Ct. 1585, 94 L.Ed.2d 775 (1987). Although this is a death-eligible case, the Attorney General has elected not to seek the death penalty. In this light, none of the defendants have demonstrated that unfairness will inhere in a joint trial, and I therefore conclude that severance of defendants in this case is not warranted.

On the other hand, I find that there is a serious risk that evidence of the existence of Hill's prior felony record might "prevent the jury from making a reliable judgment about guilt or innocence," *Zafiro*, 506 U.S. at 539, 113 S.Ct. at 938, which could not be cured by a jury instruction. Thus, count 13 shall be severed from the trial of the remaining counts.

### VIII. Government's *Ex Parte* Motion for Protective Order

The government's *ex parte* motion for a protective order requests permission to withhold, until three weeks before the start of the trial, certain evidence which may reveal the

17. The government's first response to Holland and Montgomery's motions was filed on February 24, 1997, and is the response referred to herein. The government filed an additional "Consolidated Motions Response" on August 20, 1997.

18. There is some confusion in the government's responses as to whether Hill made any statements. Holland and Montgomery filed motions to suppress to which the government responded in its February 24, 1997 filing, clearly indicating that the response was to Holland's and *Montgomery's* motions. However, in its consolidated response, the government indicated that its February 24, 1997, filing referred to statements made by Holland and *Hill*. Govt. Consol. Resp. at 66–67. In its consolidated response, the government went on to state that it "is unaware of any statements made to law enforcement officers

by the remaining codefendants." Govt. Consol. Resp. at 67. Because Hill did not file his motion to suppress statements until June 27, 1997, the government could not have been responding to Hill's motion on February 24, 1997. For this reason, it appears that the government's consolidated response mistakenly substitutes Hill's name for Montgomery's. Putting Montgomery's name in it proper place in the government's consolidated response reveals that Hill made no statements to law enforcement. For this reason, I deny Hill's motion as moot.

19. Although several defendants filed motions to sever, Hill is the only defendant who addressed his motion at the hearing held on September 29 and October 1, 1997. Thus, the motions to sever filed by all defendants other than Hill are denied at this time.

names of cooperating witnesses whose safety may be jeopardized by such disclosure. The government's supplemental *ex parte* motion for a protective order requests permission to withhold, until the day before a witness testifies, certain information which would identify certain government witnesses. Having reviewed the government's and Holland's submissions, and having carefully considered both the interests of the defendants in preparation of their defenses and the interest of the government in protecting its witnesses, I orally granted the government's request for a protective order.[20] Defendants have sought reconsideration of that order, and I shall entertain further arguments at the upcoming hearing on these issues.

### IX. Miscellaneous Motions

In addition to the foregoing motions, as of the September 29 and October 1, 1997, motions hearing, defendants filed motions requesting: exclusion of tapes (Holland)[21], bill of particulars (Holland, Coates and Hill)[22], proof of conspiracy prior to introduction of hearsay (Hill and Coates)[23], disclosure of defendant's prior record (Hill)[24],24, disclosure of identity of CI (Holland and Montgomery), production of co-defendants' statements (Hill), disclosure of impeachment evidence, exculpatory evidence and leniency information (Hill), inspection of grand jury notes (Hill), retention of rough notes (Hill and Coates), production of exculpatory income information (Holland), early release of *Jencks* material (Coates), opposition to use of Rule 404(b) evidence (Montgomery and Coates), an opportunity to inspect and copy (Hill), notice by government of intent to use evidence arguably subject to suppression (Hill) and suppression of electronic surveillance.[25] Other than previously noted, these motions are denied.[26]

### X. Conclusion

For the reasons stated, I shall grant Holland's and Montgomery's motions to suppress their statements, Hill's motion to sever count 13 of the indictment and Hill's motion to disclose his prior record. I shall deny, or reserve decision on, all other motions.

---

**20.** If, upon disclosure of materials covered by the court's ruling, defendants make a reasonable request for an opportunity to investigate, trial recesses will be taken.

**21.** This issue will be addressed at the motions hearing scheduled for November 7, 1997.

**22.** Rule 7(f) of the Federal Rules of Criminal Procedure permits the Court to direct the filing of a bill of particulars. Having reviewed the indictment, I find that it contains sufficient particulars to enable the defendants to prepare their defenses and to minimize prejudicial surprise at trial. *See e.g., United States v. Schembari,* 484 F.2d 931, 934 (4th Cir.1973). Thus, I shall deny the defendants' motions.

**23.** This issue will be addressed at trial, as it develops, and I will rule in accordance with the Federal Rules of Evidence.

**24.** Hill is entitled to disclosure of his prior record pursuant to Rule 16(a)(1)(B) of the Federal Rules of Criminal Procedure. Thus, I shall grant his motion.

**25.** Defendants Hill and Kevin Jones moved to suppress any electronic surveillance. The government submits that no electronic surveillance was used in this case. Govt. Consol. Resp. at 67. Accordingly, the defendants' motions are denied as moot.

**26.** Subsequent to the September 29 and October 1, 1997 motions hearing, with leave of the Court, defendants filed additional motions which will be addressed at the motions hearing scheduled for November 7, 1997.